IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION
*******

WESTERN WATERSHEDS PROJECT,          CV 09-159-M-CCL
BUFFALO FIELD CAMPAIGN, TATANKA
OYATE, GALLATIN WILDLIFE
ASSOCIATION, NATIVE ECOSYSTEMS
COUNCIL, YELLOWSTONE BUFFALO
FOUNDATION, MEGHAN GILL,
CHARLES IRESTONE, and DANIEL
BRISTER,

        Plaintiffs,

-vs-                            OPINION & ORDER

KEN SALAZAR, Secretary of the Interior;
SUSANNE LEWIS, Park Superintendent,
Yellowstone National Park; NATIONAL
PARK SERVICE, an agency of the U.S.
Department of Interior; LESLIE WELDON,
Regional Forester, U.S. Forest Service Northern
Region; UNITED STATES FOREST SERVICE,
an agency of the U.S. Department of
Agriculture; MARY ERICKSON, Gallatin
National Forest Supervisor,

        Defendants.

*******

Before the Court are the parties' cross-motions for summary judgment.  The Court heard oral argument from the parties from Ms. Summer Nelson for the Plaintiffs and from Mr. Paul D. Barker, Jr., and Ms. Anna Stimmel, for the Defendants.  The Court having read the papers, having reviewed the administrative record, and having heard and considered the arguments of the parties, is prepared to rule.

### Prior Bison Litigation

Prior to oral argument, the Court, believing that certain issues raised here by Plaintiffs had already been before the undersigned and the Ninth Circuit Court of Appeals, addressed the following introductory comments to counsel and the parties to review the litigation history relating to Yellowstone bison:

> THE COURT: We are ready, then, to proceed.  What we will do today, I think some little preliminary introduction by the Court is warranted in view of the fact that we've had some considerable amount of litigation in the past relating to the bison, then we will proceed after my introductory remarks.
> ***
> Now, it has been a few years since the Court has had a case involving the Yellowstone bison, but there have been a number of cases decided in the past involving the Yellowstone bison.  In some

2

respects, many of the issues here have been considered in the past, the Court has taken them into account and ruled on certain issues. I want to touch on some of those cases and to ask Counsel, in argument, to consider the applicability of some of those cases, let the Court know we are not plowing new ground here with respect to some of these issues, or are we? Are we going to sweep aside all the decisions that have been made since 1985 relating to this same topic? Let the Court know is there anything here relating to res adjudicata? Is there any stare decisis considerations here? The Court certainly should be permitted, in some respects, to take judicial notice of prior decided cases. Now, I want to just briefly review these cases.

We all know this proceeding is brought under the Administrative Procedures Act before the Court, it comes here by cross motions for summary judgment. The Administrative Act provisions, of course, are applicable. In looking back, by way of background, I think the evidence shows that around 1902 there were between 20 and 50 bison inside Yellowstone Park. Now, by the time of the first case that came before this Court in 1985, the bison had multiplied until their numbers inside the park were in the thousands.

The first case that was filed that year is commonly referred to here as Fund Case No. 1. That's not F-U-N, that's F-U-N-D. It was Fund for Animals against [Hodel]. In that case the plaintiffs sought a declaratory judgment and injunctive relief to stop the Park Service from allowing migrating bison to be killed. Bison were leaving the park because of the winter snows and a lack of adequate feed. They were starving. It also was caused, at least in part, by the cleaning of the roads of snow for snowmobile and snow coach use and, obviously, the bison would rather walk down a plowed trail than go through deep snow.

In any event, the court in that case did rule in favor of the defendants. The preferred alternative in the environmental

3

assessment did not constitute arbitrary and capricious action, neither did it mandate an environment impact study.  In other words, it wasn't Federal action that was majored [sic] in the Park's decision not to build a fence or not to feed the bison or to take other action, but in simply allowing them to migrate out of the park.

Now, incidentally, that case was not appealed. But sometime after that, I believe that in 1991, the Fund for Animals filed another case, and that is Fund Case No. 2.  The defendants were Manuel Lujan, Secretary of the Interior, and others, but notably the State of Montana was joined in that action.  An emergency injunction was requested by the proceeding, but this case sought to stop the State of Montana from shooting the – shooting bison outside the state boundaries.  In other words, in the first case the remedy sought was for the Park Service to keep the bison in; this case dealt with not allowing the bison to be [shot] when they migrated into Montana.

The court considered a number of things in that case, among other things found that the caring [sic] capacity of the park was about 2,400 animals as of that time, that the numbers of the herd exceeded that amount substantially.  Among other notable points, the court decided that this disease of brucellosis, which was carried by approximately half the bison herd at that time according to certain studies, actually was a very serious disease, that it had a substantial impact on the economy of Montana, and I think the numbers involved were that ranchers and others in the State of Montana had expended about $30 million to have the state declared brucellosis free.  And I don't recall the exact amount, but it would have amounted to millions of dollars to – of expense to Montana ranchers, in selling their cattle, to have every cow sold tested in the event that that brucellosis free designation would be lost.

In any event, out of that case the court recognized that the State of Montana has the absolute right, under its police powers in

4

protecting the health, safety and welfare of its inhabitants, to remove, by reasonable means, possibly infected trespassing Federal bison which migrate into Montana.  The court examined the disease of brucellosis, found that, according to the expert testimony, the brucellosis parasite is a facultative intracellular parasite, which in English simply means that, number one, it is a parasite.  As it invades any host, it invades the boundaries of the cell itself, therefore it's hard to reach by way of treatment.  Brucellosis, when contacted by human beings, was referred to as undulant fever.  Undulant fever at one time was a substantial health problem in this country, but it was largely eliminated by the pasteurization of raw milk.  In any event, the disease here was thought to be substantial.

Now, that case was appealed, and it went to the Circuit Court, and the Circuit Court did affirm the District Court in that case.  And I don't mean by that affirmance to suggest that everything the District Court said was endorsed by the Circuit Court, but, certainly, the result was – and there may be portions of that case where the evidence there and the findings by the Court are still of some use, or not.  In argument you can help me by telling me what the circumstance is in your mind.

Now, the next case, Greater Yellowstone Coalition, American Buffalo Foundation, Gallatin Wildlife Association, there were a number of parties here, this case was in 1996.  Here, the plaintiffs sought to enjoin an interim plan for management of bison.  Now, that included the capture and removal of bison within the park.  The parties here were striving to avoid the parties leaving – or the bison leaving the park, migrating into Montana, and the thrust of the plaintiffs' case was that the Park Service ought not be allowing capturing or killing of animals within the park.

The court here – the District Court here decided that it is permissible for park personnel to proceed to capture or kill wild game

5

in the park, and that was, incidentally, despite the existing anti-poaching statutes, which the court held were intended to apply only to members of the public.  The court made a number of findings in the case, some of which may still be pertinent.  The court found that the bison which were being removed within the park at that time were not required for the future integrity of the herd now that they were threatening neighboring landowners.  Now, there was a motion for stay of appeal in District Court, that was denied, but there is no evidence of an appeal ever having been taken from that case of which I'm aware.

The next case, then, came in 1998.  This was the Intertribal Bison Cooperative case against Babbitt.  In this case, the plaintiffs sought to enjoin the State and Federal Government agreement to manage the bison herd inside Yellowstone Park.  The District Court found that the interim bison management plan was not contrary to statute, there was no significant impact, the FONSI here was not arbitrary, failure to prepare an environmental impact statement did not violate NEPA, and this ruling has – has been made with some regularity here by the District Court where it found that the modified interim plan was also lawful.  The court stated that the National Park Service has authority to destroy park wildlife pursuant to properly prepared wildlife management plans.  The court held that the operation of the capture facility before they exit the park, and shipment of the bison for slaughter, didn't violate the National Park Service Organic Act, and particularly here – and this is a thought that is repeated by the parties throughout these cases – the seronegative bison leaving the Yellowstone Park would otherwise be destroyed by the State of Montana, and the purpose of that agreement was to prevent that.

In any event, that case was appealed, the District Court was affirmed.  And this is something that doesn't happen very often.  It

6

sure beats a decision that comes back down that says reversed and remanded.  But here the [Circuit] Court said we affirm for reasons set forth in the District Court's well-reasoned opinion and reported, and then a citation was given.  So I would think that those determinations by the District Court, perhaps, you tell me if you don't think that's the case, bear some weight in expressing the holding by the Ninth Circuit Court of Appeals.

Then the next case, this is Case No. 5, you won't find much about this case in the reports, this is the State of Montana and the Fund for Animals, which was an intervenor in the case, against Bruce Babbitt, then Secretary of the Interior.  The case was filed in 1995.  And I think it was resolved in January of 2001, and it was dismissed at that time by the court.

Now, what went on during that period of five or six years was that this was the State of Montana suing the National Park Service and the United States because these bison were regularly coming into Montana and they were a risk to the Montana economy, as noted earlier, and the parties began negotiating and trying to reach an agreement.  And to find the nature of what went on there you almost have to look at the docket sheets.  And there are quite a few pages of docket sheets.

But as the parties negotiated between the State of Montana and the Park Service, they were having difficulty in reaching an agreement.  Finally, I decided that I would order a formal settlement conference of the parties, which I did.  And rather than my meddling into the specifics of the case, I ordered that that conference be held before and supervised by Magistrate Robert Holter, which he did step into the case then, entered the negotiations, and worked and worked and worked with the parties so that some six years after the case was filed a final agreement was reached.  I approved it, and we then dismissed the action filed by the state with prejudice.

Now, that resulted in the current agreement existing between the state and the United States agencies. Assuming that the Plaintiffs are successful in this case, does that in any way renew this suit by the State of Montana? Or what is its effect? Does the State of Montana have any right to come back again to this Court and say, hey, we settled this with those people and the agencies and the Feds, Federal Government, it was an agreement, we dismissed our suit, what do we do next? I would like to hear from you lawyers here who have most of the wisdom in the room today as to what the repercussion, if any, might be. And keep in mind that the State of Montana has not been made a party to this proceeding.

Now, the next case, then, was Cold Mountain, Cold Rivers. This came along in 2004. It was interesting in some respects here in that the allegation was that hazing, which actually was intended and utilized and successfully accomplished preserving some buffalo from being killed outside the park, where they were hazed back into the park, but the Buffalo Field Campaign did not approve of the hazing even though it was, in its practice, saving the lives of those buffalos that did get out of the park and were not infected but were returned to the park rather than going to the capture facility and going through the process of being tested and so forth. In any event, the court in that case found that these eagle nests, which were held (sic) to be endangered by the hazing process by the use of snowmobiles and helicopters, were not a violation of any law, that they were within the scope of the agreement, and that they were good for the bison. The Circuit Court of Appeals listened to the appeal and affirmed the District court.

Now, I probably have bored some of you with the discussion here, but I would hope that maybe it will help you in guiding your arguments to answer some questions that the Court does have.

8

Summ. Judg. Hrg. Tr. 4:16-15:17.

## General Factual and Procedural Background

This case focuses the Court's attention on the decades-old controversy regarding the Yellowstone National Park bison herd, which is a marvelous natural resource within the care of the National Park Service and is a resource justifiably treasured by the American public.  At the end of the 19th Century, following years of hunting and illegal poaching in Yellowstone Park, the mountain bison (*Bison bison athabascae*) herd there dwindled down to just 23 bison by actual count in 1902.  NPS AR 33.  To save the herd from near-extinction, the federal government imported 21[1] plains bison (*B. b. bison*) from two captive bison herds, one in Texas and one in Montana.  NPS AR 5.  "The present bison population consists of hybrid descendants of the two subspecies."  NPS AR 5.  Initially, the two herds were kept separately and they were referred to as the "tame" herd and the "wild" herd.  By

---

[1] As reported by Mr. Arno B. Cammerer, Acting Director of the National Park Service, in a statement made to the Subcommittee of the Committee on Appropriations on January 2, 1923. See footnote 2 and accompanying text.

1923, the tame herd had increased from 21 to 578, and the wild herd had increased from 23 to 125 or 150.[2]  During the years between 1902 and 1923, the Department of the Interior donated surplus Yellowstone buffalo (as they were then called) to preserves, municipal parks, and other institutions in order to reduce the economic burden of dealing with the very prolific Yellowstone bison herd.[3]  Apparently requests for institutional donations of bison were too few to keep up with a rapidly expanding herd, so in 1923, the Department of the Interior requested Congressional permission to sell surplus tame buffalo (*i.e.*, those bison imported from outside the Park) to private citizens managing their own buffalo herds, and it went to Congress to ask for a statute that would authorize such sales to private citizens.  Significantly, the Acting Director of the National Park Service stated in 1923 that

> [n]otwithstanding the fact that practically every request for buffalo

---

[2] *Interior Department Appropriation Bill, 1924: Hearing Before the Subcomm. of the Comm. on Appropriations, United States Senate*, 67th Cong. (January 2, 1923) (statement of Arno B. Cammerer, Acting Director of the National Park Service) pp. 45-46 (Comm. Print 1923).

[3] *Id.* at 46.

coming from a public instititution has been granted, the demand from this source is too limited to have any appreciable effect in keeping the herd to such a size that it can be accommodated *on the range that is available*.  Therefore, in the interests of better administration it is desirable that some other means should be available for disposing of the surplus, either by sale or otherwise in the discretion of the Secretary.[4]

This statement was made by the Acting Director of the National Park Service in

1923, when the entire Yellowstone bison herd numbered (at least by his estimate)

a little more than 700 bison.

Thus, in response to a request by the National Park Service, Congress

enacted 16 U.S.C. § 36:

The Secretary of the Interior is authorized, in his discretion and under regulations to be prescribed by him, to give surplus elk, buffalo, bear, beaver, and predatory animals inhabiting Yellowstone National Park to Federal, State, county, and Municipal authorities for preserves, zoos, zoological gardens, and parks: Provided, That the said Secretary may sell or otherwise dispose of the surplus buffalo of the Yellowstone National Park herd, and all moneys received from the sale of any such surplus buffalo shall be deposited in the Treasury of the United States as miscellaneous receipts."

---

[4] *Id.* (emphasis supplied).

16 U.S.C. § 36 (Jan 24, 1923, ch. 42, 42 Stat. 1214).  This statute has not been repealed.  The National Park Service is authorized by Congress "to sell or otherwise dispose" of the surplus buffalo of the Yellowstone National Park herd. Congress made this provision to shield the National Park Service from the economic burden of surplus Yellowstone bison and from the lack of available range for the surplus bison, and this statute is still in force and effect today.

The Yellowstone bison herd tripled in size over the next few decades, with complete intermingling and cross-breeding between the "tame" bison and the "wild" bison herds, and with semi-ranching care for all of the Yellowstone bison (including culling, supplemental feeding, and other animal-husbandry practices) by the National Park Service.  (NPS AR 6155-56.)  (Indeed, the plains bison generally made a remarkable comeback, because plains bison are now numbered "more than 20,500 in 62 conservation herds, while the number under commercial propagation is about 400,000."  NPS AAR 9543.)  The Yellowstone bison herd is one of nine herds that are considered "genetically pure," in that they do not appear

to have been cross-bred with cattle.[5]

By 1969, the new philosophy of natural regulation of resources had reached Yellowstone National Park, and the Yellowstone Park Service began taking a hands-off approach to the Yellowstone bison. Without appreciable pressure from natural predators and with abundant forage in Yellowstone Park, however, this largely man-made herd now began to grow exponentially, and with this growth came problems and controversy. Increasingly, this large Yellowstone bison herd began to exceed the forage available within the Park on a seasonal basis. These bison are the largest mammals in Yellowstone Park (the largest land mammals in North America), weigh up to 2,000 pounds, and have the ability to pivot and to run more than 30 miles per hour. Bison can be unpredictable and dangerously aggressive. Inside Yellowstone Park boundaries, visitors are gored every year, and sometimes even killed by Yellowstone bison. They are magnificent creatures,

---

[5] The other genetically pure herds are Elk Island National Park (wood bison), Mackenzie Bison Sanctuary, Northwest Territories (wood bison), Wood Buffalo National Park, Alberta and Northwest Territories (wood bison), Elk Island National Park (plains bison), Grand Teton National Park, Henry Mountains State Park, Utah, Sully's Hill National Game Preserve, North Dakota, and Wind Cave National Park, South Dakota. NPS AAR 9557.

but not to be trifled with.  They can simply jump or blast through typical ranch fencing, and there is an old saying in Montana (containing much truth) that 'you can herd a bison just about anywhere it wants to go.'  Therefore, as the herd has increased and begun to seek forage outside the Park, a proportionate increase in human-wildlife conflicts and public safety issues have presented themselves. Yellowstone bison outside the Park find their way onto highways, residential properties, and into the middle of towns and even school yards.  There are times when bison simply cannot be encouraged or forced to move and must be removed to preserve public safety.

Through the 1980s and 1990s, as the Yellowstone bison herd began to migrate during the winter into Montana, causing property damage and presenting safety issues for people living around the Park, they presented yet another danger. Unfortunately, the Yellowstone bison herd is infected with a highly toxic and contagious disease known as Brucellosis (*Brucella abortus*), which carries with it severe consequences if transmitted to cattle or humans (in whom it is commonly known as undulant fever).  It is estimated that approximately half of the

Yellowstone bison herd has been exposed to the disease, and perhaps half of those are actually infected with the disease at any one time.

Since 1923, the basic problem has not changed, but the numbers have, because today the Yellowstone herd numbers not just 700, but 3,900, and disagreements have indeed broken out among the many parties interested in the welfare of the Yellowstone bison: rural inhabitants living in the communities and areas adjacent to the Park, private landowners, environmentalists, farmers and ranchers, livestock associations, state and local governments, and state and federal wildlife specialists, scientists, and administrators.

**Motions to Strike**

To complete the Administrative Record, the Court first decides the parties' Motions to Strike.

"Courts may review [] extra-record materials only when: (1) it is necessary to determine whether the agency has considered all relevant factors and explained its decision, (2) the agency has relied on documents not in the record, (3)

15

supplementing the record is necessary to explain technical terms or complex

subject matter, or (4) plaintiffs make a showing of bad faith." *City of Las Vegas v.*

*Fed. Aviation Admin.*, 570 F.3d 1109, 1116 (9th Cir. 1009) (*citing Sw. Ctr. for*

*Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)).

These criteria are to be "narrowly construed and applied." *Lands Council v.*

*Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).  Merely relevant materials are not

therefore reviewable under the APA.  *Id*.


**Defendants' Motion to Strike**

Defendants argue that the Plaintiffs' extra-record evidence (Doc. 34,

consisting of eight declarations and two maps) is not *necessary* to determine

whether the agency has considered all relevant factors.  In fact, most of the extra-

record materials attempt to introduce post-decision quasi-expert scientific opinions

for the purpose of setting up a battle of experts.  *See Northwest Envtl. Advocates v.*

*National Marine Fisheries*, 460 F.3d 1125, 1144 (9th Cir. 2006).

Plaintiffs have not established that Defendants relied on extra-record

materials or acted in bad faith.  Nor have they established that their extra-record submissions are *necessary* to determine whether the agencies considered all relevant factors and explained their decisions.  The extra-record submissions are clearly not necessary to explain technical terms or complex subject matter as they contain the opinions of lay people and activists.  Thus, Defendants' motion to strike Plaintiffs' Declarations (Doc. 34) is well taken (other than the standing representations in Doc. 34-3, 34-5 and 34-6, although standing does not appear to be an issue in this case and is not challenged by Defendants).  The Court believes that the Declarations containing both standing allegations and the extra-record submission should be stricken in full because standing is not in dispute and the extra-record submissions are intermixed with the standing allegations.

**Plaintiffs' Motion to Strike**

Plaintiffs move to strike the Defendants' Exhibit 1 (Declaration of NPS Wildlife Biologist Richard Wallen) to Defendants' Summary Judgment Reply Brief and its attachment, Exhibit A, which is an early draft report of Dr. Luikart

and other scientists on their five-year study of the conservation of genetic diversity in the Yellowstone bison herd.  Doc. 52-1.  Plaintiffs argue that this draft report is outside of the Administrative Record and released late in the summary judgment briefing process.

However, there are a few important points to be made.  This study was commissioned by the NPS in 2005, not in anticipation of this lawsuit.  It does support Defendants' argument that they have taken, and they continue to take, a "hard look" at the genetic integrity and diversity of the Yellowstone herd.  The report is one more verification that Defendants have taken the requisite "hard look," and they are entitled to submit it for that purpose.  This draft report in no way constitutes an agency post-hoc rationalization, as Plaintiffs would like to call it, given that this scientific study was commissioned by the NPS in 2005 and peer-review publication is forthcoming in the near future.  It is an important piece of all of the genetics work that has been considered by the Defendants, which as a body of work is substantial.  *See infra* note 12;  NPS AR 4679-4709; 7395-7406;4738-4834; 5364-5372; 5700-5762; 5329-5340; 3236-3448; 7364-7373; 7464-7533;

18

3472-3515; 6910-6914.

**Legal Standards**

**Summary Judgment**

Summary judgment is a suitable vehicle for resolution of a challenge to

agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et

seq.; *see Nw. Motorcycle Ass'n v. U.S. Dept. of Agric.*, 18 F.3d 1468, 1471-72 (9th

Cir. 1994).  However, unlike the typical civil summary judgment resolution, the

Court does not make findings of fact or determine the existence of genuine issues

of material fact.  The Court must instead review the Administrative Record that

was before the federal agency at the time it made its decision to determine whether

the record supports the agency's decision or whether the agency's decision is

arbitrary, capricious, or otherwise contrary to law.  5 U.S.C. § 706; *Florida Power*

*& Light Co. v. Lorion*, 470 U.S. 729 (1985).

**Administrative Review**

None of the statutes supporting Plaintiffs' Amended Complaint contains a private right of action, and therefore review is obtained by Plaintiffs pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.  APA judicial review is limited to determining whether the agency acted in a manner "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  The burden of persuasion is placed on the party bringing the APA case.  *See Comm. to Preserve Boomer Lake Park v. Dept. of Transp.*, 4 F.3d 1543, 1555 (10th Cir. 1993).  Judicial review is limited to the administrative record before the agency decision maker.  *Fla. Power & Light Co.*, 470 U.S. at 743-44.

When evaluating agency action, courts extend deference to the agency's interpretation of the statutes and regulations that the agency administers.  *Natural Res. Def. Council v. Dept. of Interior*, 113 F.3d 1121, 1124 (9th Cir. 1997).  An agency's interpretation of its own regulations controls unless it is "plainly erroneous or inconsistent with the regulation[s]."  *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 717 (9th Cir. 1993) (internal quotations omitted).  For example, the Forest Service's interpretations of its own Forest Plans are given this

20

deference.  *See Lamb v. Thompson*, 265 F.3d 1038, 1047 (10th Cir. 2001).

Deference is also appropriately extended to matters within the agency's scientific

expertise.  *See Ecology Center v. Castaneda*, 574 F.3d 652, 658-59 (9th Cir. 2009).

It is not the role of the courts to "weigh competing scientific analyses."  *Id.* (*citing*

*Lands Council v. McNair ("Lands Council II")*, 537 F.3d 981, 988 (9th Cir. 2008)

(en banc)).

A decision may be reversed as arbitrary and capricious "if the agency relied

on factors Congress did not intend it to consider, 'entirely failed to consider an

important aspect of the problem,' or offered an explanation 'that runs counter to

the evidence before the agency or is so implausible that it could not be ascribed to

a difference in view or the product of agency expertise.'"  *Lands Council II*, 537

F.3d at 987 (*quoting Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156

(9th Cir. 2006)).

**Discussion**

In 2000, the U.S. Department of the Interior, National Park Service, and the

U.S. Department of Agriculture, the U.S. Forest Service, and the Animal and Plant

21

Health Inspection Service ("APHIS") released a Final Environmental Impact

Statement ("FEIS") regarding the Interagency Bison Management Plan ("IBMP").

An agency Record of Decision, issued on December 20, 2000, chose the Modified

Preferred Alternative, consisting of a three-step plan for spatial and temporal

separation of bison from cattle as a means of controlling the risk of Yellowstone

bison transmitting brucellosis to cattle in the Greater Yellowstone Area ("GYA").

In 2005, the IBMP was adjusted to allow bison hunting in the State of Montana by

licensed hunters and American Indians with treaty rights.  NPS AR 7680.  In 2007,

the General Accounting Office conducted an audit of the IBMP and noted a failure

to progress from Step One to Step Two by the anticipated deadline and criticized

the IBMP partners generally for failing to establish metrics by which the IBMP's

success could be measured.  NPS AR 6143-6194.  In response, the agencies

prepared the 2008 Adaptive Management Plan by which it amended the IBMP to

correct the problems identified by the GAO Report and establish the needed

metrics.  NPS AR 7179-7188.  Under the Adaptive Management Plan, for

example, APHIS and the MDOL planned to track the number of bison slaughtered

22

by "document[ing] the number, age, sex, and sero-status of bison sent to slaughter."  NPS AR 7185.  This documentation was required to further one of the goals of the IBMP, which is to reduce the need for lethal removals of bison.  The adaptive management techniques to be used instead of lethal removals are increased hazing, state and treaty hunting, quarantine, and sending bison to alternate areas.  NPS AR 7185.  The three main goals of the Adaptive Management Plan are to increase tolerance for bison outside the Park to the north and west, to conserve a wild, free-ranging bison population, and to prevent the transmission of brucellosis from bison to cattle.  NPS AR 7179.

Clearly Plaintiffs are not supporters of the 2000 IBMP.  However, the six-year statute of limitations applicable to APA claims precludes a direct challenge to the IBMP.  28 U.S..C. § 2401(a); *Hells Canyon Preservation Council v. U.S. Forest Serv.*, 593 F.3d 923, 930 (9th Cir. 2010).  Instead, Plaintiffs take issue with several of the adaptive management changes that have unfolded during the ten-year period of IBMP operations.  Plaintiffs argue that full NEPA analysis should have been conducted prior to making these changes.   Plaintiffs also argue that the

Defendants should prepare a supplemental environmental impact analysis for the IBMP to address genetic integrity/diversity, changes in livestock grazing on public lands, and risk of brucellosis transmission, as well as the adaptive management changes of 2008.

     I.      Alleged Failure to Comply With NEPA.

         1. NEPA Standard.  The purpose of the National Environmental Policy Act ("NEPA") is to "encourage productive and enjoyable harmony between man and his environment...."  42 U.S.C. § 4321 et seq.  However, NEPA imposes procedural rather than substantive requirements.  *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989).  Pursuant to NEPA, federal agencies prepare reports such as Environmental Assessments ("EA") and Environmental Impact Statements ("EIS") on "major Federal actions significantly affecting the quality of the human environment...."  42 U.S.C. § 4332(C).  An EA is prepared to determine whether an EIS is required and to inform the public of the proposal of the action, the available alternatives, and the environmental impact considerations.  40 C.F.R. § 1508.9.  An agency may determine that an EIS is not required, at which time the

agency must issue a finding of no significant impact ("FONSI"), sometimes based on a categorical exclusion ("CE") of that category of action from preparation of an EIS.  40 C.F.R. §§ 1507(b)(2)(ii), 1508.4; 40 C.F.R. § 1500.4(p).

After an EA or EIS has been prepared, further NEPA analysis may be required if the agency makes substantial changes affecting the environment to the proposed action or if significant new information arises that affects the quality of the environment "in a significant manner or to a significant extent not already considered." *Marsh*, 490 U.S. at 374.  Under NEPA, when an agency makes a change in a project but determines that supplemental NEPA documentation is not required, a court "must defer to that informed discretion." *Price Road Neighborhood Ass'n v. Dept. of Transp.*, 113 F.3d 1505, 1509-12 (9th Cir. 1997) (internal citation omitted).

NEPA also requires that the public be informed of an agency's considerations of environmental issues during the decisionmaking process. *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983). At the suggestion of the GAO, and in addition to specific-action notifications to

the public, the agencies have created a website to inform the public regarding its

decisionmaking and consideration of environmental issues vis-a-vis the

Yellowstone bison herd.[6]

      2. Kilpatrick Article.  Plaintiffs claim that Defendants have not

appropriately considered a study by Kilpatrick in 2009 that discusses risk of

brucellosis transmission from bison to cattle.[7]  Plaintiffs claim that the study

shows that the risk of transmission of brucellosis from bison to cattle is near zero,

and Plaintiffs believe that this study presents new information requiring new

NEPA analysis.  However, the Kilpatrick study actually says that the risk of

transmission of brucellosis from Yellowstone bison to neighboring cattle is near

zero because the bison and cattle are kept apart both spatially and temporally, and

because of this management the risk of transmission is near zero.  "[T]he current

---

[6]  The website makes the IBMP Annual Reports and many other IBMP documents available to the public at http://ibmp.info/.  NPS AR 7570.

[7]  A. Marm Kilpatrick, Colin M. Gillin, and Peter Daszak, *Wildlife-Livestock conflict: the risk of pathogen transmission from bison to cattle outside Yellowstone National Park*, Journal of Applied Ecology 2009.  NPS AR 7219-7228.

management plan . . . prevents bison from coming near grazing cattle in space and

time (essentially reducing the risk of transmission to zero). . . ."  NPS AR 7220.

The Kilpatrick study notes that when the herd is large and the weather severe,

there are "occasional years of substantially higher risk."  NPS AR 7222.  In fact,

the Kilpatrick study considers seven scenario resulting in differing risk of

transmissibility.  Scenario 7, wherein there would be no more culling of the herd,

estimates that the herd abundance would increase to 7,000, and states that this

would "substantially increase the number of bison outside the Park [to thousands

of bison in the winter], and the risk of transmission by 20-fold compared to

scenario 1 [herd size 3000, less than 200 bison outside the Park]."  NPS AR 7223.

This study acknowledges that the years of high risk "increase with increasing

bison populations and severe snowfall or thawing and freezing events (Gates *et al.*

2005)."  NPS AR 7226.  Although the Court is aware that the Kilpatrick study is

recent and makes a significant contribution to science and to knowledge about

Yellowstone bison, the Kilpatrick study does not actually prove anything

significantly new, in a legal sense, in the context of this case, *e.g.* it does not reject

27

prior scientific understandings or present novel information of a type that has never before been considered by the Defendants in prior NEPA analysis.  The Defendants have obviously considered the Kilpatrick study because it is contained in the administrative record.  NPS AR 7680, 7684.  There is simply nothing in the Kilpatrick study that should require preparation of a supplemental environmental impact statement on the IBMP.

The Kilpatrick study strongly comes down in favor of adaptive management, stating that "[c]learly adaptive management will be most effective." NPS AR 7226.  It is noteworthy that the Kilpatrick study acknowledges that there is a "strong relationship between bison population size and the number of bison that leave the park (equation 2), and the stochasticity inherent in snowfall and weather processes, suggest that the risk of transmission will grow as bison populations grow, but in a haphazard fashion, and with great year-to-year variability."  NPS AR 7226.

In addition, taken by itself, the claim that Defendants have failed to prepare a supplemental EIS based on the Kilpatrick study is not a site-specific allegation

28

as is required by *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004).

        3.  Rate of Seroprevalence of Brucellosis.  Plaintiffs claim that the

Yellowstone bison herd is increasingly testing seropositive for brucellosis, instead

of decreasingly seropositive, as was expected under the IBMP.  Plaintiffs assert

that Defendants have not appropriately considered this significant new

information.  It is true that the IBMP assumed that the estimated 40-60% herd

seroprevalence would decrease with the IBMP's proposed vaccination program.

However, the IBMP vaccination program has not proceeded as quickly as was

expected, but a draft environmental impact statement regarding remote delivery

vaccination of bison in the Park was released for public comment in 2010.  75 F.R.

30022.  The Final EIS on the remote delivery vaccination program is expected to

be completed in the near future.  The study cited by Plaintiffs simply points out

that seroprevalence is not decreasing as was anticipated under the IBMP.  NPS AR

7691.  The Defendants are aware of the literature and the somewhat inconsistent

evidence on the point whether seroprevalence is remaining constant or increasing

slightly.  Due to the fact that a new NEPA analysis is in progress on the

vaccination program and the Defendants' awareness of current status of seroprevalence in the herd, no significant information has arisen that would justify revisiting the NEPA analysis of the IBMP.  Plaintiffs fail to show the significance of the seroprevalence data and why it requires supplemental NEPA analysis.

In addition, taken by itself, the claim that Defendants have failed to prepare a supplemental EIS based the seroprevalence data is not a site-specific allegation as is required by *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004).

4.  Polymerase Chain Reaction ("PCR") Test.  Plaintiffs assert that Defendants have failed to use a Polymerase Chain Reaction ("PCR") Test to identify actual infected bison.  Defendants respond that the PCR Test is not yet available for use in bison and may not even yield accurate results for bison when the infection is intracellular, at which point the only certain testing available requires killing the bison to examine its lymph nodes.  NPS AR 3196.  The NPS believes that the PCR test "shows promise for increasing accuracy of detection" but it is not yet able to detect "a high percentage of infected animals after the bacteria becomes intracellular."  NPS AR 3196.  Unfortunately, there is no quick

30

and easy blood test that identifies *Brucella abortus* bacteria.  That is why there is
an ongoing Environmental Assessment being performed on a Quarantine
Feasibility Study.  NPS AR 4495.  The NPS and APHIS are seeking better
diagnostic tools.  Defendants have considered the study promoted by Plaintiffs,
*see* NPS AAR 8997, but do not believe that it provides significant new
information beyond what is already known and studied.  Plaintiffs also fail to
acknowledge the implications of the fact that seropositive bison may be latent
carriers of brucellosis that lapse in and out of actual infected states
("recrudescence").  NPS AR 7594.  Plaintiffs fail to show that the PCR Test is
significant new information that requires further NEPA analysis.

    In addition, taken by itself, the claim that Defendants have failed to prepare
a supplemental EIS based on the alleged existence of a real-time PCR Test is not a
site-specific allegation as is required by *Norton v. S. Utah Wilderness Alliance*,
542 U.S. 55, 64 (2004).

        5.  Genetic Diversity and Population Demographics.  Plaintiffs assert
that Defendants have not appropriately responded to new studies regarding genetic

31

diversity in the Yellowstone bison herd.  However, Defendants have not only

considered the issue of genetic diversity in the IBMP FEIS, *see* NPS AR 650-652,

782, the Defendants have considered all the bison genetic diversity literature since

the FEIS, and Defendants have also commissioned (*i.e.*, assisted in obtaining

funding for) an academic study of the issue.  NPS AR 6885-86, 6910-6925, 6926-

6936, 6593.  No new information contained in the genetic diversity literature

requires further IBMP NEPA analysis.

The newest study commissioned by the NPS was recently released as a final

project report: "Conserving Genetic Diversity in Yellowstone Bison: The effects

of population fluctuations and variance in male reproductive success in age

structured populations," A. Pérez-Figueroa, T. Antao, J.A. Coombs, and G.

Luikart (Technical Report for the National Park Service, June 2010.  Mammoth

Hot Springs, Wyoming, YCR-2010-07).  (Doc. 52-1 at 5-40.)  This study, which

has been submitted for professional publication and is currently under peer review,

shows that the Yellowstone bison "consist of a single population with at least two

breeding herds (subpopulations) that are not genetically distinct but show some

32

genetic differences."  Doc. 52-1, Wallen Dec. at 2.  The fact that the study was

conducted, as well as its conclusions, demonstrates that the National Park Service

is carefully monitoring and preserving the Yellowstone herd's genetic diversity

within the context of the IBMP and specifically with regard to seasonal culls of

the herd. " The results [of the study] suggest that culling to maintain population

census size goals will seldom accelerate loss of genetic variation when population

size remains larger than 2,000 to 3,000 individuals." (Doc. 52-1 at 19.)

Recommending maintaining a herd between 2,500 and 4,500 bison and

maintaining average population census above 3,000 bison, the study also assumes

that infrequent large population fluctuations will occur.  (Doc. 52-1 at 19.)

Because the current herd size is 3,700, there is no imminent or future threat of

irreparable harm to the genetic diversity of the Yellowstone bison herd.  The

adaptive management plan under the IBMP calls for severely limiting the criteria

for lethal removals when the herd size falls to 2,300 and a cessation of lethal

removals when the herd size drops to 2,100.  NPS AR 7185.  The NPS has

diligently continued to monitor the size and population characteristics of the

Yellowstone herd throughout the IBMP period and has continued to conduct and fund studies to promote its understanding of the best practices to preserve the herd's genetic diversity.  Plaintiffs fail to show that new scientific information is significant to an extent or degree not analyzed in the existing NEPA documents by the Defendants or that additional NEPA analysis is necessary.

In addition, taken by itself, the claim that Defendants have failed to prepare a supplemental EIS based on new genetics studies is not a site-specific allegation as is required by *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004).

6.  Removal of cattle from Horse Butte/other areas.  Plaintiffs argue that closing of the Horse Butte Peninsula grazing allotment presents a new circumstance that should alter the need for bison management in this area. However, IBMP managers have been documenting the vacant grazing allotment on the Horse Butte Peninsula at least since 2005.  The Defendants continue to operate the Horse Butte Bison Capture Facility, which itself is supported by NEPA analysis, because there are still cattle grazing within the area on the southwest side of the peninsula and north of Lake Hegben, and bison swim across the Lake or

walk across it when the Lake is frozen.  USFS AR Doc. 68, App. A at 1-2, 6, 11.

       7.  Prior NEPA Analysis is not stale.  Plaintiff argues that the IBMP

FEIS was based on false assumptions.  Of course, there have been changes in the

IBMP program in the past ten years, which changes have been documented.  The

question is whether the changes are so significant in extent or so new that a

supplemental environmental analysis is appropriate.  *Marsh*, 490 U.S. at 374.

However, in this case Plaintiffs do not show significant changes.  For example,

Plaintiffs argue that the IBMP FEIS assumed that brucellosis could be eliminated

in wildlife.  To the contrary, the FEIS stated that "elimination of brucellosis, even

in bison, is not within the scope of this management plan."  NPS AR 614.

    Additionally, the FEIS did not assume that elk were not responsible for any

brucellosis disease transmission.  NPS AR 1265.  The Defendants continue to

consider and study the rates of brucellosis infection in the elk that winter in

Yellowstone Park.  NPS AAR 7616-7619; 9379-87.  Recent studies indicate that

the rate of infection among elk in the northern Park is low (2-4% seropositive) and

that transmission of the infection from bison-to-elk is rare.  NPS AAR 9379.  Elk

to cattle transmission of brucellosis demonstrates that brucellosis can be

transmitted from wildlife to cattle, and there is no reason believe that bison cannot

also transmit brucellosis to cattle.  The fact that there is no documented

transmission of brucellosis from wild bison to cattle is most likely due to the fact

that Yellowstone bison have historically been kept apart from cattle outside Park

boundaries, and during the IBMP period that has certainly been the case.  This is

evidence of the success of the IBMP.  Evidence regarding elk-to-cattle

transmission is not new and significant evidence relevant to the bison, except that

it does prove that wildlife-to-cattle transmission does occur, and it also provides

no reason to think that it would not occur were Yellowstone bison to be allowed to

come into contact with neighboring herds of cattle.

      8.  Agencies complied with NEPA in the IBMP FEIS for Adaptive

Management Adjustments.  The adaptive management philosophy in natural

resource conservation is based upon the unremarkable notion that resource

managers should evaluate the results of their efforts and adjust their actions

according to what they have learned from their experiences with the natural

resource system being managed.  This natural resource management philosophy

emphasizes learning from experience to better manage complexity and uncertainty.

However, Plaintiffs challenge certain of Defendants' "adaptive management"

changes to the IBMP as not having been properly documented by NEPA analysis.

Defendants carefully documented their consideration of adaptive

management changes to the IBMP:

> "These agencies [USDA APHIS, USFS, DOI NPS, MTFWP,
> MTDOL] anticipated future adaptive management adjustments to the
> IBMP based on research, monitoring, and feedback from the
> implementation of a suite of conservation and risk management
> actions.  After eight years of experience in implementing the IBMP,
> the agencies formally agreed to several short- and long-term adaptive
> management adjustments in December 2008.  These adjustments were
> based largely on new information, changing landownership and use,
> and newly gained operational experience.  However, they were
> intended to be applied within the framework of the IBMP and not
> alter its basic management direction or goals."

NPS AR 7384.  For example, the IBMP anticipated that eventually there would be

a limited number of untested bison permitted to enter public and private lands

north and west of Yellowstone National Park during winter.  (ROD p. 22, p. 36.)

This was not expected to happen all of a sudden, but gradually, over time, in a

37

controlled fashion, after observing the behavior of a limited number of bison.

Thus, in 2008, one of the proposed adaptive management actions was to "[a]llow

untested female/mixed groups of bison to migrate onto and occupy the Horse

Butte peninsula and the Flats each winter and spring in Zone 2." NPS AR 7384.

Also, the IBMP anticipated that research would be conducted regarding the

viability of *Brucella abortus* bacteria shed in the field during winter and spring,

with the expectation that the knowledge gained would be used to determine

appropriate temporal separation between migrating bison and grazing cattle. NPS

AR 7385. Making use of that information gained by research and experience was

contemplated by the IBMP FEIS, and would not require further NEPA analysis

unless the management changes affect the environment in a manner or to a degree

not previously considered.

The IBMP program managers conscientiously examined the adaptive

management changes made to the IBMP for the purpose of determining whether

NEPA supplementation was necessary, and they determined in 2009 that the

adaptive management changes would not affect the environment in a manner or to

a degree not previously considered.  NPS AR 7384-7388.  The adaptive

management changes "were intended to be applied within the framework of the

IBMP and not alter its basic management direction or goals."  NPS AR 7384.

Plaintiffs allege specifically Defendants failed to conduct appropriate NEPA

analysis for three adaptive management changes involving (i) the Horse Butte

Special Use Permit Renewal, (ii) the Royal Teton Ranch ("RTR") Fence Special

Use Permit, and (iii) the RTR Grazing Restrictions.

(i) The Horse Butte Special Use Permit.   In 1999, the Forest Service

issued the first Ten-year Special Use Permit to the Montana Department of

Livestock ("MDOL") to permit the MDOL to capture and test migrating bison as

they exit Yellowstone Park.  At that time, the Forest Service had conducted an

Environmental Assessment and a Biological Assessment and made a Finding of

No Significant Impact.  That NEPA analysis was approved by this Court and the

Ninth Circuit.  *See Cold Mountain v. Garber*, 375 F.3d 884, 893 (9th Cir. 2004).

Since then, during five of the past 10 years, the MDOL has operated this

temporary facility (several holding pens on two acres) on the Gallatin National

39

Forest, just outside the western boundary of Yellowstone Park.  The Horse Butte

Capture Facility is authorized for operations between November and May of each

year.  The IBMP managers believe that this capture facility "continues to be an

important bison management tool."  USFS AR Doc. 68 at 2.

In 2009, the U.S. Forest Service renewed the Horse Butte Capture Facility's

Special Use Permit.  Incorporating the original NEPA analysis by reference, the

renewal decision determined that the renewal should be categorically excluded

("CE") from further NEPA analysis because no extraordinary circumstances were

involved and no change or increase in scope or intensity of the authorized facility

is expected, and "environmental impacts have been minimal, as predicted."  USFS

AR Doc. 68 at 8; *see* 36 C.F.R. § 220.6(e)(15).  The Decision Rationale concludes

that "ultimately the lack of the capture tool [Horse Butte Capture Facility] would

limit tolerance for bison in Zone 2 west of Yellowstone National Park."  USFS AR

Doc. 68 at 12.

(ii) Royal Teton Ranch Fence.  One of the Adaptive Management

Plans identified in December, 2008, called for increased tolerance for Yellowstone

40

bison (specifically, bison testing seronegative) on private lands along the western Yellowstone River corridor north of Yellowstone Park through which the bison can eventually access public lands.  This plan involved purchase by MT FWP of 30-year grazing rights from Royal Teton Ranch and construction of a fence to control the movement of Yellowstone bison.  The Forest Service granted MT FWP a special use permit to construct the fence on USFS land.  Approximately 4900 feet (1.1 acre) of four-strand smooth wire fence was constructed on National Forest System lands and 2.2 miles of four-strand wire fence was constructed on private RTR lands.  The fence is designed to allow smaller wildlife to pass under it. Only two wires are electrified, and the fence is designed to be taken down when not in use for bison purposes between January and April.  In approving of this fence, the Forest Service relied upon the categorical exclusion ("CE") regulation that exempts further NEPA analysis (*i.e.*, EA and EIS) for "approval, modification, or continuation of minor special uses of NFS lands that require less than five contiguous acres of land."  36 C.F.R. § 220.6(e)(3).  The ultimate purpose of the fence and the special use permit, quite obviously, is to give Yellowstone bison a

41

safe place for winter migration and forage opportunities outside of Yellowstone

Park.  In fact, this very plan was anticipated by the IBMP FEIS, which proposed in

the modified preferred alternative that lands north of Yellowstone Park should be

made available for winter forage for seronegative Yellowstone bison as Step 2 of

the IBMP.  NPS AR 523-524.  Furthermore, the Gallatin Ranger District did

prepare a detailed Biological Assessment for the "Gardiner Basin Bison Fence

Construction" in 2009 before granting the special use permit for the fence.  USFS

Doc. 86.

This adaptive management action was clearly implemented in order to

benefit the Yellowstone bison and provide it with adjacent migration/forage

territory.  It is a reasonable action contemplated by the IBMP FEIS, and the NEPA

analysis was both reasonable and adequate under the law.

(iii) RTR Grazing Restrictions.  Plaintiffs assert that additional NEPA

analysis was required before the NPS helped the State of Montana fund RTR

grazing restrictions.  The RTR Grazing Restrictions are the necessary companion

project to the RTR Fence initiative (and the more expensive of the two), for it is

42

necessary that RTR refrain from grazing its cattle on its private property when Yellowstone bison migrate north in the winter.  To accomplish that end, the State of Montana purchased RTR's grazing rights for 30 years, and the NPS contributed to the funding of this project.  However, Plaintiffs are incorrect when they claim that this is a new development lacking in NEPA analysis.  This project was contemplated by the modified preferred alternative of the IBMP FEIS.  It was contemplated that restriction of grazing of cattle on RTR would be funded by the IBMP state and federal partner agencies.  NPS AR 615, 619, 755.  The Record of Decision specifically tied the acquisition of RTR's Reese Creek grazing rights to Step Two of the Joint Management Plan.  NPS AR 2806.  In other words, the acquisition of RTR grazing restrictions is part of the original NEPA analysis accomplished by the IBMP FEIS.  It is not merely within the scope of what was contemplated by the FEIS, it was actually contemplated by the FEIS.

The Court concludes that Plaintiffs have failed to support their claims that Defendants have violated NEPA.  The Defendants decision not to prepare a supplemental environmental impact statement for the IBMP was reasonable under

43

all these circumstances.


II.      Alleged Failure to Comply with NFMA.

1.  NFMA Diversity Requirement.  The National Forest Management

Act of 1976 ("NFMA"), 16 U.S.C. § 1601 et seq., requires that the Forest Service

maintain Forest Plans that "provide for multiple use and sustained yield of the

products and services obtained" from the Forest, including "coordination of

outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness...."

16 U.S.C. § 1604(e)(1).  As the language of the NFMA indicates, the NFMA "is to

be addressed in light of overall multiple use objectives." *Seattle Audubon Soc. v.*

*Mosely*, 80 F.3d 1401, 1404 (9th Cir. 1996).  The NFMA requires that the

Secretary of Agriculture establish regulations that specify guidelines for Forest

Plans goals to

provide for diversity of plant and animal communities *based on the*

*suitability and capability of the specific land* area in order to meet

overall multiple-use objectives....

44

16 U.S.C. § 1604(g)(3) (emphasis supplied).  Elsewhere, in the Multiple Use

Sustained Yield Act of 1960 ("MUSY"), 16 U.S.C. §§ 528-531, Congress has

recognized that "[n]othing herein shall be construed as affecting the jurisdiction or

responsibilities of the several States with respect to wildlife and fish *on the*

*national forests*."  16 U.S.C. § 528 (emphasis supplied).  Indeed, a state has

"historical powers to manage wildlife on federal lands within its borders" unless

Congress manifests a contrary purpose.  *Wyoming v. United States*, 279 F.3d 1214,

1231 (10th Cir. 2002) (*citing Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230

(1947)).  In this case, MUSY clearly indicates that states are to be permitted their

traditional management role with respect to wildlife on national forests.  And the

State of Montana does not permit Yellowstone bison on the Gallatin National

Forest except in a limited fashion under controlled circumstances as set forth in

the IBMP.

The question posed by Plaintiffs is whether the Forest Service, and

specifically the Gallatin National Forest ("GNF")) should be required to *put* bison

on the forest in order to provide animal diversity under the NFMA, and the answer

to that question, under these particular circumstances, must be no.  There have not

been bison on the Gallatin National Forest for 100 years (give or take the

occasional bison groups wandering out of the Park).  (In fact, when the Gallatin

National Forest was created in 1899, there were no bison on the forest then,

either.)  The NFMA recognizes that the Forest Plan has a multiple-use objective.

Putting Yellowstone bison, and diseased bison at that, on the Gallatin Forest

would interfere with multiple uses of the Forest and would violate the State of

Montana's wildlife management program for the Gallatin Forest.  Based on its

commitment to multiple uses, its participation in the IBMP, and its cooperation

with the State of Montana's wildlife management on the GNF,[8] it is apparent that

the Forest Service came to the reasonable conclusion that the GNF is not currently

suitable for the Yellowstone bison except as permitted by the IBMP.  Based on

that conclusion alone, the Forest Plan need not provide for bison.

---

[8] The Forest Plan explicitly directs the Forest Service to coordinate with the
NPS, the State of Montana, and private land owners with respect to management
of wildlife.  USFS AR Doc. 1 at II-17.

There is plentiful big game habitat on the Gallatin Forest.  The management indicator species for that habitat is elk.  Elk are abundant on the Gallatin National Forest.  USFS AR Doc. 1 at V-11.  Taking into consideration the suitability of the land for big game species, there are already diverse and abundant big game on the Gallatin National Forest such that NFMA's animal diversity requirement is met.  The Gallatin National Forest's failure to set standards for the practically non-existent Yellowstone bison on the Gallatin Forest does not violate the NFMA's diversity requirement and is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).

Not only have Plaintiffs failed to show that the Forest Service have failed to meet the requirements of the Gallatin Forest Plan and the NFMA, Plaintiffs fail to tie this complaint to a site-specific challenge.  "Challenges to forest-wide management practices or claims that the Forest Plan does not comply with NFMA must be made in the context of site-specific actions." *Ecology Center v. Castaneda*, 574 F.3d 652, 658 (9th Cir. 2009) (*citing Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 734 (1998)).

2.  NFMA Regulation Requirements.  The 2000 NFMA Regulations require that the Forest Service meet the diversity requirement of the NFMA by complying with the Forest Plan and using the best available science.  36 C.F.R. § 219.35.  Courts grant considerable deference to agencies on issues requiring great technical expertise, including the important question of what is the best available science.  *Ecology Center*, 574 F.3d at 658-59.  To the extent that Plaintiffs argue that the best available science indicates that the viability of the Yellowstone bison herd is at risk, that argument is without merit.  Based on the best available science before it, the Forest Service reasonably determined that the Yellowstone bison herd is viable and genetically diverse.  It is not this court's role to weigh competing scientific analyses, *Lands Council II*, 537 F.3d at 988, and, in any event, even if it were, the best available science clearly indicates that the Yellowstone bison herd is viable and secure.  75 F.R. 45717-01 (USFWS rejection in 2007 of a petition to list Yellowstone bison herd under the Endangered Species Act); NPS AR 4012, 6100-6013, 8941, 8944, 9013-14, 9188.

3.  NFMA Forest Plan Requirement.  The GNF Forest Plan identifies

48

a goal to "provide habitat for viable populations of all indigenous wildlife species and for increasing populations of big game animals."  USFS AR Doc. 1 at II-1. The Forest Plan provides standards (forage, cover, other habitat features) for managing big game habitat.  USFS AR Doc. 1 at II-18.  The indicator species for big game is elk.  USFS AR Doc. 1 at II-18.  There is no requirement that the Forest Plan provide individual standards for each individual species on the Forest. Nor is the Forest Plan required to provide standards for sagebrush habitat because there are very few sagebrush obligate species in the Forest due to the elevation. USFS AR Doc. 680, 694.  Here, too, Plaintiffs fail to tie their sagebrush habit and sagebrush dependent species complaints to any site-specific final agency action. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004). The Forest Plan explicitly directs the Forest Service to coordinate with the NPS, the State of Montana, and private land owners with respect to management of wildlife.  USFS AR Doc. 1 at II-17.

The Court concludes that Plaintiffs have failed to support their claims that Defendants have violated NFMA.

49

III.    Alleged Failure to Comply with National Park Service Organic Act or

Yellowstone Enabling Act.

1.  NPS Organic Act.  Plaintiffs argue that the NPS is failing to observe its

mandate to conserve Park resources and refrain from impairing the same.  16

U.S.C. § 1.  Plaintiffs state that the NPS has failed to make a written determination

considering the question of impairment for each of its bison decisions, as is

required by the NPS Management Policies 2006.  However, the NPS Management

Policies "are intended only to provide guidance within the Park Service, not to

establish rights in the public generally," *River Runners for Wilderness v. Martin*,

593 F.3d 1064, 1072 (9th Cir. 2010), and they "are not enforceable against the Park

Service."  *Id.* at 1073.  Furthermore, the NPS did consider whether the IBMP

would cause such an impairment.  The Record of Decision concluded that

> there is no indication that the actions set out in the Joint Management
> Plan will cause the impairment of any park resources and values.  The
> National Park Service recognizes that with this cooperative Joint
> Management Plan, it is better able to preserve bison and is in keeping
> with the Yellowstone enabling act.

NPS AR 2834.

50

This Court has determined that the NPS Organic Act "allows [NPS] to determine whether selective removal of individual bison protects and conserves the YNP bison herd." *Intertribal Bison Cooperative v. Babbitt*, 25 F.Supp.2d 1135, 1138 (D. Mont. 1998), *aff'd sub nom., Greater Yellowstone Coalition v. Babbitt*, 175 F.3d 1149 (9th Cir. 1999).  This principle is clear in cases of diseased animals.  However, Congress has also established a principle that is clear as to surplus bison, because in 16 U.S.C. § 36 Congress established the rule that the Secretary of the Interior may donate Yellowstone bison to "Federal, State, county, and municipal authorities for preserves, zoos, zoological gardens, and parks," and that the Secretary may "sell *or otherwise dispose of* the surplus" Yellowstone bison.  16 U.S.C. § 36.  This statute applies to the entire Yellowstone bison herd today, because there is no more "tame" as opposed to "wild" herd–those two herds having been long ago completely interbred into one herd.  NPS AR 5.

    2.  Yellowstone Enabling Act.  The Secretary of the Interior is charged with the duty of care and management of Yellowstone Park.  The Secretary "shall provide against the wanton destruction of the fish and game found within the park,

and against their capture or destruction for the purpose of merchandise or profit."
16 U.S.C. § 22.  The administrative record in this case belies Plaintiffs' claim that
the NPS has ever sanctioned the wanton destruction of bison.  Indeed, for decades,
the NPS has devoted a tremendous amount of scientific study and resources to the
task of considering how best to manage the Yellowstone bison.  In fact, because of
the depth of research and study performed by and for the NPS, that agency is
actually best situated to determine how to cull the herd to achieve optimal results
for long-term herd demographics.  The Park Service believes that "[m]anagement
for more than 3,000 bison in the Yellowstone population should preserve more
than 95% of existing genetic diversity over hundreds of years."  Doc. 52-1 at 3
(Decl. of Richard Wallen).  The NPS has not violated the Yellowstone Enabling
Act in the manner in which it has carried out its duties under the IBMP, and
specifically in its program of culling the herd under the IBMP for population
control and brucellosis eradication.

Ironically, the adaptive management changes to the IBMP that Plaintiffs
challenge in this legal action (*e.g.*, the RTR fence, the RTR grazing rights

52

purchase, the continued permitting of the Horse Butte capture facility) were all anticipated by the IBMP to further the goal of providing the Yellowstone bison with additional territory for winter grazing outside the Park.  These have been beneficial changes for the Yellowstone bison, because the bison are now being permitted to range outside the Park to the north and to the West as an experiment to allow the IBMP partners to learn more about winter migration behavior. Admittedly, progress is slow, but that is due partly the nature of scientific inquiry, the environmental procedural responsibilities imposed by Congress, and the experiential and step-wise process of adaptive management.  Yet there has been steady progress, and the future under the IBMP promises additional progress.

The Court is in general agreement with Defendants, and urges the Defendants in this case, as well as the IBMP cooperating agencies, to continue in their efforts to conserve and protect the Yellowstone bison.  The Court holds that NPS has the authority to sell and otherwise dispose of surplus Yellowstone bison under its governing statutes.  The Court further holds that Plaintiffs have failed to prove that Defendants have acted in a manner "arbitrary, capricious, an abuse of

discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

**Motion for Preliminary Injunction and/or
Temporary Restraining Order**

After the Administrative Record had been completed and the case

submitted, the Court studied all aspects and reached a preliminary decision in

favor of Defendants. However, before the Court had implemented this decision by

setting it forth in final opinion and order format, Plaintiffs filed a Motion for

Preliminary Injunction and/or Temporary Restraining Order. Defendants

answered, and Plaintiffs replied, attaching to their reply brief a previously

unknown and allegedly "expert" study. The Court was perplexed and ordered

Defendants to file a sur-reply brief, in the interest of fairness. This sur-reply was

received February 10, 2011.

The Court now addresses the request for injunctive relief in light of the

foregoing and the new legal standards applicable thereto. Some repetition is

necessary as the Court shifts gears to analyze this claim for an extraordinary

remedy as distinguished from the Court's role under the administrative appeal. Plaintiffs' Motion seeks an injunction against the National Park Service to prevent the Interagency Bison Management Program ("IBMP") managers from shipping for slaughter approximately 150 of the 380 bison captured inside of Yellowstone National Park on January 31-February 2, 2011.

Serious problems with the Yellowstone bison developed in the 1980s when the herd had been allowed to reproduce freely to numbers exceeding the forage capacity of the Park to fully support it during winter months.  Bison began to migrate from the Park into Montana causing the State of Montana to take direct action against the bison.  Initially, state wildlife officers would remove the bison by shooting them.  Later, the state annually managed a bison hunt where licensed members of the public would hunt and shoot the bison after they came into Montana.

The Yellowstone National Bison herd is infected with a serious contagious disease called Brucellosis.  This is a global disease that threatens both animals and humans.  In the last century, Brucellosis has been almost completely eradicated in

the United States by lengthy and expensive programs conducted by both federal

and state governments at a cost of hundreds of millions of dollars.  In wildlife and

livestock, there is no effective treatment; nor is there yet a completely effective

vaccine for bison.  It is difficult to assess whether bison having antibodies

showing exposure to the disease actually have the disease, as bison may go in and

out of active disease states.  Brucellosis may lurk internally in wildlife in the

lymph nodes, mammary glands, and reproductive organs without exhibiting itself

clearly in blood testing.  In humans, the disease is often called undulant fever, and

treatment can be difficult and chronic symptoms can last for years.  Humans can

suffer a lifelong chronic illness, even death.   Unfortunately, Yellowstone National

Park is one of the last reservoirs of Brucellosis in the United States because both

Yellowstone bison and elk are known to be chronically infected with this disease.

A 1990 Texas A & M controlled experiment[9] proved that bison can transmit

the disease to cattle, and there are other studies that corroborate this finding.  NPS

---

[9]  Davis, D.S., J.W. Templeton, T.A. Ficht, J.D. Williams, J.D. Kopec, and L.G. Adams,"Brucella abortus in captive bison. I. Serology, bacteriology, pathogenesis and transmission to cattle."  J. Wildlife Diseases 26 (3):360-371 (1990).

AR 277.  This Court has held it to be proven that bison can transmit brucellosis to cattle. *Fund for Animals, Inc. v. Lujan, U.S. Dept. of Agric., State of Montana, Montana Fish, Wildlife & Parks, Montana Dept. of Livestock, ("Fund Suit II")*, 794 F.Supp. 1015 (1991), *aff'd*, 962 F.2d 1391 (9th Cir. 1992).  Also, the National Academy of Sciences has noted that "transmission of brucellosis from naturally infected captive bison to cattle has been reported; captive bison under range conditions in North Dakota were in contact with beef cattle during the winter (Flagg 1983).[10]  Bison-to-cattle transmission in Arkansas has also been reported."[11]  It is false to assert that bison-to-cattle transmission of brucellosis has never been demonstrated.  Under the IBMP, no such contact between Yellowstone bison and grazing cattle is permitted.  It is a testament to the success of the IBMP that no documented transmission of bison-to-cattle have been recorded in the

---

[10]  "A case history of a brucellosis outbreak in a brucellosis free state which originated in bison."  Proceedings of the U.S. Animal Health Association 87:171-172.

[11]  "Brucellosis in the Greater Yellowstone Area," N. Cheville, D. McCullough, L. Paulson, National Research Council, Wash., D.C. 1998 (National Academy of Sciences); NPS AR 277.

Greater Yellowstone Area in the past ten years.

Litigation began in 1985, when the Fund for Animals, Inc., sued Secretary Hodel of the Department of Interior to stop the National Park Service from allowing migrating bison to be killed. *Fund for Animals v. Hodel ("Fund Suit I")*, CV 85-250-BU-CCL.  The second Fund for Animals case was filed in 1991. *Fund Suit II"*, 794 F.Supp. 1015 (1991), *aff'd*, 962 F.2d 1391 (9th Cir. 1992).

The State of Montana began to weary of its institutional role in controlling herd size of the Yellowstone bison.  As a result, in 1995, the State of Montana sued Secretary of the Interior Bruce Babbitt, to require the National Park Service to control its wandering bison and not leave that job entirely up to the State of Montana.  *State of Montana v. Babbitt, et al.*, CV 95-06-H-CCL.  During the next four years, the State of Montana and the National Park Service attempted to negotiate a settlement of their differences.  When they were unable to reach early agreement, the Court assigned a senior magistrate to provide court-supervised settlement conferences.  These mediated negotiations were eventually successful and resulted in the Joint Bison Management Plan, which is the progenitor of the

Interagency Bison Management Plan. The proposed settlement between the State of Montana and the National Park Service was presented to the Court and was approved and adopted by the Court.  This settlement was based upon years of effort by the lead litigants, the State of Montana and the Department of the Interior, and the other litigants such as the Department of Agriculture and the Royal Teton Ranch.  Now called the IBMP, this agreement has now been in force and effect for 11 years.  Not only is it the standard and primary tool for management of the Yellowstone bison herd as between the State of Montana and the National Park Service, but it is also the tool relied upon by other cooperating partners and stakeholders such as USDA Animal Plant and Health Inspection Service, the Montana Department of Livestock, Indian tribes, private landowners, national forest administrators, and others.

Recently, and not unexpectedly, Yellowstone bison have again migrated outside the northern boundary of Yellowstone Park to lower elevations where they are not tolerated by the State of Montana.  Repeated hazing operations have not managed to return the migrating bison to the Park, where severe winter conditions

and high snowpack have limited forage opportunities.  These bison have been hazed back into the Stephens Creek Capture Facility, where they are being tested for exposure to brucellosis disease, all pursuant to the IBMP.  Bison testing positive for brucellosis will be shipped for slaughter immediately.  This facility has been used for these purposes since at least 1996.  NPS AR 2798.  The Park Service hopes to hold the sero-negative bison through the winter, although the Stephens Creek bison capture facility will hold only 400 bison, and this year's bison migration may markedly exceed that capacity.  The IBMP also permits seronegative bison to be shipped to slaughter when the herd population exceeds 3,000, as it now does.

Over the past ten years the herd has shown remarkable resiliency, and following the removal of 125 bison this winter pursuant to state and tribal hunting licenses, the Yellowstone herd is now numbered at 3,700.  (NPS AR 9379-87, 9698; Doc. 59 at 11.)  Recent research funded by NPS indicates that a population range of 2,500 to 4,500 bison, averaging 3,000 over a decade, will support a genetically diverse herd with highly resilient characteristics. Doc. 52-1, ¶¶ 16-17.

60

These criteria have been satisfied under the IBMP.

A temporary restraining order is an "extraordinary remedy" that is not a right or an entitlement.  A party may obtain a temporary restraining order upon a clear showing of entitlement.  *See Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 376 (2008).

The legal standards applicable to a temporary restraining order are the same as apply to a request for preliminary injunction.  *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  The applicant must show (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm that would result if an injunction were not issued, (3) the balance of equities tips in favor of the plaintiff, and (4) an injunction is in the public interest.  *See Winter*, 129 S.Ct. at 376.  Not only must the injury be immediate, it must also be irreparable.  *Id.*  In the alternative, Plaintiffs may satisfy the Serious Questions Test so that they need only show (1) "serious questions going to the merits," (2) a likelihood of irreparable harm, (3) a "balance of the hardships tipping sharply in plaintiff's favor," and (4) the injunction is in the public interest.  *See Alliance for*

*the Wild Rockies v. Cottrell*, ___ F.3d ___, 2011 WL 208360 (9th Cir. Jan. 25, 2011).

The Interagency Bison Management Program has been in effect for a decade.  It has led to greater tolerance of bison outside of Yellowstone Park, and in fact it has enlarged the land within the bison's migratory range and resulted in fewer lethal removals by the State of Montana.  Although there have been many individual bison culled from the herd during the past 10 years, an effort has been made to cull diseased and not healthy bison, and so to promote the long-term health of the herd.  The National Park Service could simply choose to feed the bison within the interior of the Park to keep them from migrating into Montana (as was regularly done decades ago), but the Park Service is now obligated to follow the protocols that have been carefully wrought by the IBMP and that have undergone full environmental analysis.  This Court has considered the alternative of feeding the herd inside of the Park, but tends to agree with the NPS that such a measure is less beneficial to the overall health of the Yellowstone bison herd than the capture and test program already in place.  Promoting population expansion by

62

supplemental feedings would likely lead to more problems for the herd.

It has been established that the State of Montana is entitled to remove infected Yellowstone Park bison as they cross over the Park boundaries. *Fund Suit II*, 794 F.Supp. 1015 (1991), *aff'd*, 962 F.2d 1391 (9th Cir. 1992). The National Park Service may capture and kill wild game within the Park under approved wildlife management plans. *Greater Yellowstone Coalition, et al. v. Babbitt, et al.*, 952 F.Supp. 1435 (1996). Operation of a capture facility by the Park Service that results in the shipment of seropositive bison to slaughter does not violate the National Park Service Organic Act when it saves seronegative bison that would otherwise be destroyed by the State of Montana. *Intertribal Bison Cooperative  v. Babbitt*, 25 F.Supp. 1135 (1998), *aff'd sub nom, Greater Yellowstone Coalition v. Babbitt*, 175 F.3d 1149 (9th Cir. 1999).

The factual and legal context of the Plaintiffs' Motion for Preliminary Injunction and/or Temporary Restraining Order is such that the current management action of penning and testing Yellowstone bison is but one action of many called for by an approved federal-state wildlife management plan. Although

63

potentially diseased seropositive Yellowstone bison may be shipped to slaughter, the overall health of the Yellowstone bison herd is not in any way jeopardized by this culling. The culling of individual Yellowstone bison is not an irreparable harm *per se*. *See Intertribal Bison Cooperative v. Babbitt*, 25 F.Supp.2d 1135 (D. Mont 1998) (NPS permitted to remove bison for overall purpose of protecting and conserving YNP bison herd), *aff'd sub nom, Greater Yellowstone Coalition v. Babbitt*, 175 F.3d 1149 (9th Cir. 1999).

Plaintiffs' evidence falls even further below the irreparable harm standard in this case because the individual animals to be culled are of a non-listed species, and, in fact, would be subject to lethal removal by the State of Montana if not removed by the NPS. *See* Mont. Code Ann. § 81-2-120. Plaintiffs have failed to show that the Yellowstone herd might suffer any injury, let alone irreparable injury. Indeed, the herd has shown remarkable resilience following much larger culls in the winters of 2006 and 2008 (which were caused in part by the fact that the herd grew to an overabundance of more than 5,000 bison in 2005). It should emphatically be acknowledged that the Yellowstone bison is plentiful and

64

reproductively prolific and, of course, is not a listed species under the ESA.  *See*

72 Fed. Reg. 45717-01 (USFS' 2007 rejection of petition to list Yellowstone bison

under the Endangered Species Act).

Plaintiffs' urge the Court to find that a likelihood of irreparable harm exists

through the threatened loss of genetic diversity by the seasonal culling of

Yellowstone bison under the IBMP.  Nothing in the scientific research before

February 8, 2011, indicated a threatened loss of genetic diversity in the

Yellowstone bison.[12]  On that day, however, under cover of Plaintiffs' Reply Brief

---

[12] *See* J. Fuller, R. Garrott, P.J. White, K. Aune, T. Roffe, J. Rhyan, *Reproduction and Survival of Yellowstone Bison*, Journal of Wildlife Management 71(7):2365-2372 (2007) (NPS AR 5364-5372).

F. Gardipee, *Development of Fecal DNA Sampling Methods to Assess Genetic Population Structure of Greater Yellowstone Bison* (Spring 2007) (unpublished M.S. thesis, University of Montana) (NPS 5700-5762).

J.E. Gross, G. Wang. N.D. Halbert, P.A. Goga, J.N. Derr, and J.W. Templeton, *Effects of Population Control Strategies on Retention of Genetic Diversity in National Park Service Bison (Bison bison) Herds* (Final Report, Yellowstone Research Group USGS-BRD, Dept. of Biology, Montana State University, March 2006) (NPS AR 4679-4709.

N. Halbert, *The Utilization of Genetic Markers to Resolve Modern Management Issues in Historic Bison Populations: Implications for Species Conservation* (December 2003) (unpublished Ph.D. dissertation, Texas A&M University) (NPS AR 3236-3448).

N. Halbert, J. Derr, *A Comprehensive Evaluation of Cattle Introgression into US Federal Bison Herds*, Journal of Heredity (Dec. 16, 2006) (NPS 5329-5340.

P. Hedrick, *Conservation Genetics and North American Bison (Bison bison),* Journal of Heredity (May 4, 2009) (NPS 7364-7373).

in Support of Plaintiffs' "Motion for Preliminary Injunction and/or Temporary Restraining Order," Plaintiffs submitted an unpublished and unreviewed paper prepared by one Thomas H. Pringle.  *See* Doc. 60-1.  This document had not heretofore been made known to Defendants or the Court.  It is not part of the administrative record.  Plaintiffs additionally attach as Exhibit 2 a Reuters article trumpeting the issuance of this 11th hour bison genetics paper by Pringle.[13]

Defendants did not move to strike this secret paper or Plaintiffs' reply brief, but proceeded to file a penetrating sur-reply brief on February 10, 2011. Defendants make the following important points in their sur-reply brief:

1.      The Pringle "study" was prepared during the course of this litigation for the purpose of advancing Plaintiffs' interests in this litigation.

---

G. Wilson, K. Zittlau, *Management Strategies for Minimizing the Loss of Genetic Diversity in Wood and Plains Bison Populations at Elk Island National Park*. (NPS 3472.)

A. Pérez-Figueroa, T. Antao, J.A. Coombs, and G. Luikart, *Conserving Genetic Diversity in Yellowstone Bison: Effects of population fluctuations and variance in male reproductive success in age structured populations.*  Technical Report for the National Park Service, June 2010, Mammoth Hot Springs, Wyoming, YCR-2010-07 (Yellowstone Center for Resources. 2010) (publication forthcoming).  Doc 52-1.

[13]  Laura Zuckerman, *Study links Yellowstone bison fate to genetic flaw*, available at http://uk.reuters.com/articles/2011/02/08/us-bison-yellowstone-idUKTRE7170DA20110208, Feb. 7, 9:00 pm ET.  Doc. 60-2.

2.    The Pringle study, is self-published on-line and has not been accepted for peer-reviewed publication.

3.    Although he certified to the contrary, the author of the Pringle study is not unbiased because he has a conflict-of-interest in this case, in view of his position on an advisory board of Plaintiff Western Watersheds Project.

Doc. 63. 2-4.  This detracts from Pringle's credibility as any sort of expert in this case.  The situation is further complicated by the manner in which the existence of Pringle's study was brought into this case.  It appeared as part of the last paper to be filed to submit the issue of injunctive relief to the Court.  Plaintiffs first presented their motion and brief for injunctive relief.  Defendants responded to that with an excellent answer brief.  Plaintiffs then had an opportunity to respond by reply to Defendants' answer brief.  Instead, what Plaintiffs did was to insert into the record a heretofore undisclosed secret study.  Had Plaintiffs wanted to rely on the study, notice could have been given to the Defendants and the Court either during the administrative proceedings or after this litigation was commenced. This would not have deprived Defendants of an opportunity to respond, as occurred here.  The Court was perplexed and disappointed by this because it

67

indicates a failure to exercise a good faith application of the intent and spirit of the federal rules of procedure.  It is litigation by ambush.

Then, without approval of the Court, Plaintiffs filed an additional pleading titled "Notice of Additional Authority and Clarification" (Doc. 62), wherein Plaintiffs' counsel took the Court to task for feeling perplexed and argued that their reply brief and attachments were perfectly appropriate.  However, it is contrary to custom and practice in this district court to file a reply brief inserting new materials with an "expert" opinion which deprives the other parties of a complete opportunity to respond.  In the interests of justice and fairness the Court permitted a few days to Defendants to evaluate this new study, which is an inadequate amount of time to make any meaningful study of the Pringle paper and to prepare a scientific response to it.  The Court has considered the Pringle paper, but under these circumstances attributes somewhere between little and no weight to it.

No geneticist has had an opportunity to review Pringle's paper, and this Court is not equipped with the scientific background necessary to evaluate its

validity.  Nevertheless, the Court is confident that the Defendants in time will fully

investigate the Pringle paper and in good faith take such actions, if any, as may be

warranted.

Plaintiffs have not shown a likelihood of success on the merits and cannot

show that the injunction is in the public interest, or in the Yellowstone bison

herd's interest, for that matter.  After applying the Serious Questions Test, the

Court finds that Plaintiffs' evidence does not meet that test either.  The balance of

the equities definitely does not tip sharply in Plaintiffs' favor.  The capture, test,

and slaughter program has been undertaken following full NEPA analysis that has

been carefully reviewed by this Court.  In addition to carrying the threat of

brucellosis disease, migrating bison outside Yellowstone Park also threaten human

safety and private property damage, and eventually might come into conflict with

traffic on Montana Highway 89.  Doc. 59-1, § 13.  The Court finds that the critical

public interest in animal health and public safety would not be served by granting

the injunctive relief requested.  *See Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596

F.3d 1098, 1114-15 (9th Cir. 2010).  Plaintiffs' proposed injunction to save the

69

lives of individual Yellowstone bison would not serve the best interests of the Yellowstone bison herd.  The relief requested by Plaintiffs would sweep aside all progress achieved in bison management in the past 25 years and would disable the IBMP but would not lead to a better state of affairs for the Yellowstone bison.  It would surely lead to an equivalent (or greater) number of lethal removals by the State of Montana (accomplished by state employees and by organized hunts), which is within the adjudicated legal rights of the State of Montana.  Far better that NPS wildlife managers cull the herd in a manner informed by science and proper wildlife management objectives.

**Conclusion**

This is not the first time the District of Montana and Ninth Circuit courts have been down this path, and each time it is seemingly under claimed emergency conditions.  For those of us who admire the Yellowstone bison, it is easy to be sympathetic to an emotional appeal to "stop the slaughter."  Yet it is clear that this population of wild bison – diseased and healthy  – ought not be allowed to

reproduce prolifically beyond the capacity of its range without the institution of scientific management.  This has been recognized and authorized by Congress and well-implemented administratively in proper fashion.  Distasteful as the lethal removal may be to some, it is clearly one of the foremost management tools – time honored – necessarily utilized to protect the species, the habitat, and the public. There is an annual season for lethal removal for wild animals in most of the United States and particularly in the states surrounding Yellowstone Park.  Deer, antelope, elk, moose, and others are removed annually as deemed necessary in order to scientifically control populations and accomplish these same resource goals.  This is called "hunting season," and the phenomenon is widely accepted by the public.

For all of the foregoing reasons and the studies and authorities relied on by Defendants, the Court concludes that Defendants have not violated the National Environmental Policy Act, the National Forest Management Act, the National Park Service Organic Act, or the Yellowstone Enabling Act, and that the requisites for injunctive relief have not been proven.

Accordingly,

IT IS HEREBY ORDERED Defendants' Motion to Strike Plaintiffs' Declarations (Doc. 42) is GRANTED and Doc. 34 is STRICKEN, except for allegations as to standing in Doc. 34-3, 34-5, and 34-6.  Plaintiffs' standing has not been challenged by the parties or the Court.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Strike Defendants' Exhibit (Doc. 53) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Preliminary Injunction and/or Temporary Restraining Order (Doc. 56) is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment is GRANTED (Doc. 39) and Plaintiffs' Motion for Summary Judgment (Doc. 32) is DENIED.  Plaintiffs are denied all relief.

Let judgment enter.

Done and Dated this 14th day of February, 2011.

CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE