IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

*******

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, BUFFALO FIELD CAMPAIGN, TATANKA OYATE, GALLATIN WILDLIFE ASSOCIATION, NATIVE ECOSYSTEMS COUNCIL, YELLOWSTONE BUFFALO FOUNDATION, MEGHAN GILL, CHARLES IRESTONE, and DANIEL BRISTER, | CV 09-159-M-CCL |

Plaintiffs,                                                          ORDER

-vs-

KEN SALAZAR, Secretary of the Interior;
SUSANNE LEWIS, Park Superintendent,
Yellowstone National Park, NATIONAL
PARK SERVICE, an agency of the U.S.
Department of Interior; LESLIE WELDON,
Regional Forester, U.S. Forest Service Northern
Region; UNITED STATES FOREST SERVICE,
an agency of the U.S. Department of
Agriculture; MARY ERICKSON,
Gallatin National Forest Supervisor,

Defendants.

*******

Plaintiffs again move for injunctive relief, this time pending appeal. Defendants oppose the motion.  The Court has previously denied Plaintiffs' similar request and will deny this motion because there is no emergency as represented by Plaintiffs, and Plaintiffs are plainly not entitled to this extraordinary relief.

As a preface to this decision, the Court notes three recent developments:

1.    The State of Montana Governor's Executive Order No. 1-2011, dated February 15, 2011 (Doc. 71-1), recognizes the current extent and danger of the Brucellosis disease in fifty percent of the Yellowstone National Park ("YNP") bison herd and prohibits transport of YNP bison into Montana for slaughter for 90 days.[1]  By that spring date, the bison will not be exiting the Park. Seemingly any claimed "emergency" has ended.  This Executive Order alone seems to have

---

[1]  "Executive Order No. 1-2011 Prohibiting the Importation of Bison into the State of Montana for a Period of 90 Days."  Doc. 71-1.

utterly decimated Plaintiffs' argument for injunctive relief; however, Plaintiffs have filed two briefs since the date of the Executive Order without even acknowledging its existence, let alone its effect as to the pending motion.

2.     The Defendant NPS declares by the Declaration of P.J. White, Chief of Aquatic and Wildlife Resources in Yellowstone National Park, that no YNP bison have been shipped to slaughter this winter and there is no immediate plan to ship bison to slaughter.  Doc. 71-2.  The Court notes that the Defendant NPS does not concede away its right to ship bison to slaughter, as a general proposition, but it appears to be improbable that any shipment will occur this winter or spring.

3.     The Montana Legislature has before it Senate Bill 144, which prohibits translocations of YNP bison into Montana and prohibits free-roaming bison in Montana.  Doc. 71-3.  This proposed legislation underscores Montana's oft-stated desire to limit incursions of brucellosis-exposed bison from the YNP herd into the jurisdiction of the State of Montana.  This bill has been passed by the Montana Senate; it awaits action by the House of Representatives and, if enacted,

by the Governor.[2]

**Standard for Injunction Pending Appeal**

The same standards that apply to a motion for preliminary injunction apply to a motion for preliminary injunction pending appeal. *See Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983).

Federal Rule of Civil Procedure 62(c) provides that

> [w]hile an appeal is pending from an interlocutory order or final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's interests...."

The four relevant factors considered by the Court in analyzing the motion for injunction pending appeal are these: (1) whether Plaintiffs are likely to succeed on

---

[2] There are a half-dozen bills pending before the Montana legislature that assert Montana's right to lethally remove and to contain YNP bison or to restrict the movement of YNP bison within the State of Montana.  House Bill 318, Senate Bill 144, Senate Bill 207, Senate Bill 212, Senate Bill 237, Senate Joint Resolution 14.  Text of bills available at http://mt.gov/access.asp.  Go to "Montana Legislature 2011 Session Information (LAWS)."  Unfortunately, the Court does not know and cannot predict the ultimate outcome of these legislative bills, nor of other actions taken by Montana agencies or officers.

the merits, (2) whether Plaintiffs are likely to suffer irreparable harm absent an injunction, (3) whether the balance of equities tips in Plaintiffs' favor, and (4) whether the injunction is in the public interest. *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 129 S.Ct. 365, 374 (2008). Plaintiffs must "shoulder the burden" of meeting these four factors. *See Fund for Animals v. Clark*, 27 F.Supp.2d 8, 10 (D.D.C. 1998). "[P]laintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." *Alliance for the Wild Rockies v. Cottrell*, ___ F.3d ___, 2011 WL 208360 (9th Cir. 2011) (*citing Winter*, 129 S.Ct. at 375-76). In the alternative, utilizing the Serious Questions Test, Plaintiffs may show that there are serious questions on the merits, that they are likely to suffer irreparable harm, that the balance of equities tips sharply in Plaintiffs' favor, and the injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 2011 WL 208360 at *4.

## DISCUSSION

First, the Court considers this injunction request in its historical and legal context. The Yellowstone National Park bison herd is managed by Defendant

5

NPS under the 2000 Interagency Bison Management Plan, which is itself the result of approximately a decade of litigation and negotiation between two agencies of the State of Montana (Department of Fish, Wildlife, and Parks, and the Department of Livestock) and three agencies of the United States (the National Park Service, the Animal and Plant Health Inspection Service, and the Forest Service).  The IBMP is supported by a Final Environmental Impact Statement and Record of Decision.  The IBMP is a wildlife management program for the Yellowstone National Park bison herd that governs the herd both within the Park and within the State of Montana.  One purpose of the program is risk management outside the Park and the prevention of injury to humans and property damage. Another very important purpose of the program is to allow wildlife managers to better understand how the YNP bison use their available habitat in order to adapt and improve the overall wildlife management program in the future.  The IBMP requires the state and federal agencies to work together to contain YNP bison within the Park except as monitored and controlled by the agency partners according to the overall wildlife plan.  The IBMP calls for monitoring, hazing,

6

capture, vaccination, lethal removal, and other management actions relating to the

YNP bison herd.  Under the IBMP, the NPS is the lead agency to conduct bison

capture inside YNP, and MDOL is the lead agency to conduct bison capture

outside YNP.

Part of the purpose of the IBMP is to create and operate a wildlife

management plan that utilizes and provides for the conduct of research regarding

the health of the YNP herd, which is to say that the IBMP is a science-based plan.

For example, the IBMP partners are currently conducting a remote-delivery

vaccination study to work towards reducing the rate of brucellosis infection in the

herd.  The IBMP partners are also conducting a quarantine study for the purpose

of eventually relocating surplus disease-free bison to tribal governments and other

organizations.  The IBMP is a multi-faceted scientific approach to YNP bison

management that calls for constant monitoring of the herd abundance and

estimating of future herd abundance, study of migration patterns and

experimentation with providing additional land for migrations, and continued

assessment of the necessary population size to retain genetic diversity and

ecological function (such as providing prey and carrion for other species) of the

YNP herd.  Currently under the IBMP, if the YNP herd size drops to 2,300 bison,

non-lethal management measures will be increased.  If the YNP herd size drops to

2,100, all hunting and lethal measures for brucellosis control will be terminated.

Under the IBMP, some bison are permitted outside the Park to the north and

west.  However, when large numbers of bison begin to exit the Park they may be

hazed back into the Park, captured (often when hazing does not work), tested, and

lethally removed.  Lethal removal is always the risk management tool of last

resort.  The IBMP partners have been trying to reduce the number of bison sent to

slaughter by setting up a quarantine program from which bison could be donated

to tribal governments and other entities.  Unaccountably, Plaintiffs are opposed to

this plan.[3]   Because of the impressive reproductive capacity of the YNP herd,

however, "approximately 200-450 bison would need to be culled" in most winters

---

[3]  *See Western Watersheds Project, Gallatin Wildlife Association, Buffalo Field Campaign & Yellowstone Buffalo Foundation v. State of Montana, Montana Department of Fish, Wildlife & Parks*, Cause No. DV-10-317A (Montana Eighteenth Judicial District Court, Gallatin County, filed March 23, 2010).

in order to maintain a stable population and discourage mass migrations out of the Park.[4]  Failure to cull that many sero-positive bison for several winters could result in an eventual mass migration of one thousand or more bison outside the Park, and the State of Montana is authorized to destroy all these bison that enter Montana because they are brucellosis-exposed.  Mont. Code Ann. § 81-2-120(1)(b); *Fund for Animals, Inc. v. Lujan*, 794 F.Supp. 1015, 1020 (D. Mont. 1991).  All YNP bison are brucellosis-exposed by virtue of being part of an infected herd.  It is difficult to verify that a bison is not infected with brucellosis because false-negative tests can occur during early stages of infection.  NPS AR 5968.  Multiple tests over time are required before a bison can be certified to be brucellosis-free. NPS AR 7336.

Plaintiffs argue that an injunction prohibiting Defendant NPS from shipping bison to slaughter under the Interagency Bison Management Plan will preserve the status quo.  The IBMP has been in legal force and effect for the past 11

---

[4]  "IBMP Briefing Statement," Yellowstone National Park, June 22, 2009. NPS AR 7430.

years.  The IBMP is the status quo, and the request for injunction seeks to destroy that status quo.  The IBMP represents almost twenty years of scientific and legal efforts to craft a consistent and sustainable wildlife management plan for the YNP herd as regards the state and federal boundary.

The IBMP is not perfect.  It is an amalgam of consensus of the agencies of two governments.  With YNP adamantly refusing to permit hunting or lethal removal within the Park, and Montana being compelled to stop, or at least regulate, the influx of diseased bison at the border in order to protect the health, welfare, and private property rights of its citizens, the IBMP has been recognized as the best vehicle to achieve the goals of all participants.

Plaintiffs argue that without interim relief, the merits of the underlying litigation will be decided.  The Court disagrees.  The merits of the underlying litigation have little to do with shipping bison to slaughter.  The underlying litigation consists of numerous allegations that the federal defendants ought to supplement the IBMP FEIS with a new EIS and concludes that the IBMP must be mothballed until a supplemental EIS is prepared.  Plaintiffs' emotional argument

10

severely discounts the value, the accomplishments, and the necessity of the IBMP program.  It has been no mean feat to secure the agreement of these five agencies of two governments.  Even if Plaintiffs' underlying claims were found to have merit, the IBMP program should continue in force and effect during the many years required to produce the new studies demanded by Plaintiffs.

Without undue repetition, the Court recalls the statutory authority that opposes the relief sought by Plaintiffs.  The Secretary of the Interior may "provide in his discretion for the destruction of such animals and of such plant life as may be detrimental to the use of any of said parks, monuments, or reservations."  16 U.S.C. § 3.  "The Secretary of the Interior is authorized, in his discretion and under regulations to be prescribed by him, to give surplus elk, buffalo, bear, beaver, and predatory animals inhabiting Yellowstone National Park to Federal, State, county, and municipal authorities for preserves, zoos, zoological gardens, and parks...."  16 U.S.C. 36.  And the "Secretary may sell *or otherwise dispose* of the surplus buffalo of the Yellowstone National Park herd...."  16 U.S.C. §36 (emphasis supplied).

11

There is nothing in the NPS Organic Act or the Yellowstone Organic Act that prohibits NPS from shipping surplus and/or diseased Yellowstone bison to slaughter.  The regulation cited by Plaintiffs prohibits NPS from accepting a surplus bison application from an individual or private institution "when the animals are to be slaughtered, or are to be released without adequate protection from premature hunting."  36 C.F.R. 10.3(d).  There is nothing in this regulation that diminishes the statutory authority and prevents the NPS itself from "selling or otherwise disposing" of a surplus bison.  Under section 36, surplus bison can be given away, can be sold, and can be "otherwise disposed," which includes destroying the surplus bison.  This definition is supported by 16 U.S.C. § 1, which permits the Secretary to destroy animals "as may be detrimental to the use of any of said parks, monuments, or reservations."  The finding of detriment is implicit in the word "surplus," which means, as Mr. Cammerer told a House subcommittee in 1923, that even after giving away all the bison it could, the National Park Service could not keep the Yellowstone "herd to such a size that it can be accommodated

12

*on the range that is available.*"[5]  Prudence dictates that this range must be

protected so that there continues to be a harmonious balance between habitat

health and herd size.  Similarly, the Yellowstone bison herd today has apparently

reached a population abundance that cannot be seasonally accommodated on the

range that is available within Yellowstone Park.  Bison exiting the Park are

surplus bison that may be "otherwise disposed" by Defendant NPS by any means,

including slaughter, under an approved wildlife management plan such as the

IBMP.  This is a well-thought out program of selective removal that takes into

account the disease status of individual animals, the risks to people and property

outside the Park, and the long-term health of the herd.  Contrary to Plaintiffs'

claim, the fact that a number of of YNP bison may be lethally removed in a

particular winter does not make those removals non-selective.

Plaintiffs argue that they will suffer irreparable harm in contemplating the

_____

[5]  *Interior Department Appropriation Bill, 1924: Hearing Before the Subcomm. Of the Comm. On Appropriations, United States Senate,* 67th Cong. (January 2, 1923) (statement of Arno B. Cammerer, Acting Director of the National Park Service) p. 46 (Comm. Print 1923).

slaughter of YNP bison and that those bison will also suffer irreparable harm. First, it is obvious that such alleged harm is not *likely* or in any way imminent given Executive Order 1-2011 and the White Declaration.  Secondly, the harm threatened to Plaintiffs is inconsistently suffered in that Plaintiffs are not apparently troubled by lethal removals conducted pursuant to treaty hunting or state-licensed hunting.  Plaintiffs are apparently troubled by lethal removals only when they are conducted by government officials.  Such a showing of irreparable harm is weak and inconsistent.

Plaintiffs cite *Fund for Animals v. Norton*, 281 F.Supp.2d 209 (9th Cir. 2003), and *Fund for Animals v. Clark*, 27 F.Supp.2d 8 (D.D.C. 1998), to support their assertion that they will suffer an aesthetic injury from contemplating the thought of bison being killed.  Those two cases are both non-precedential and distinguishable, however.  In *Clark*, the court found that there had been a NEPA violation, and thus it was clear that plaintiffs would succeed on the merits of their NEPA claims.  Similarly, in *Norton*, the court first found that plaintiffs had shown that defendants had violated NEPA,  *id.* at 237, and, secondly, found that the

14

plaintiffs had developed special relationships with individual birds and even

occasionally named them, *id.* at 214.  It was the combination of the two factors

(law violation and aesthetic injury) that supported the likelihood of a irreparable

harm in *Norton*.  In *Clark*, also, the court based a finding of irreparable harm on a

combination of the aesthetic injury with the finding of a NEPA violation.  *Clark*,

27 F.Supp.2d at 14.  In this case, Plaintiffs have failed to establish that a NEPA

violation occurred.[6]

Thus, the Plaintiffs in the instant case fail to satisfy their heavy burden of

persuasion in demonstrating irreparable harm based upon allegations of aesthetic

injury.  Plaintiffs' showing of aesthetic injury is weak and inconsistent, and

furthermore Plaintiffs have failed to show any actual violation of law.

The culling of individual Yellowstone bison is not an irreparable harm *per

se*.  *See Intertribal Bison Cooperative v. Babbitt*, 25 F.Supp.2d 1135 (D. Mont

1998) (NPS permitted to remove bison for overall purpose of protecting and

---

[6]  These cases are additionally distinguishable because the wildlife in each
case were not otherwise subject to lethal removal by a state.

conserving YNP bison herd), *aff'd sub nom, Greater Yellowstone Coalition v. Babbitt*, 175 F.3d 1149 (9th Cir. 1999).  Culling an individual bison is not the same as cutting down a tree, which may take years, even decades, or centuries, to be replaced with another mature tree.  An animal culled in a proper population management program is replaced within a matter of months; this is the harvest of a renewable resource.

Most important, the Yellowstone herd is not in any way irreparably harmed by the proposed slaughter of a few hundred diseased and brucellosis-exposed bison out of 3,700.  The Park's Chief of Wildlife Resources has read Plaintiffs' eleventh-hour scientific paper (which is neither peer-reviewed nor published) and declared that nothing in that paper changes the Park's view as to the security of the herd.  Doc. 63-1.  An agency must not disregard available scientific evidence better than the evidence on which it relies.  *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006).  However, in this case, because the Pringle study has not been peer-reviewed and published and because the author sits on Plaintiff Western Watershed's advisory board, it is not obviously better scientific

16

evidence than that upon which the agency relies.

No grouping of prolific animals can be allowed to reproduce without limitation indefinitely unless its food supply and range is also capable of continual expansion. While there may be some increase in availability of Montana range, infinite expansion is not possible here. Every year in Montana, many wildlife species are harvested by lethal removal (hunting) under state-licensed programs, in part for the purpose of population control. For example, during Montana's hunting season, over 20,000 elk are harvested annually, over 20,000 antelope are harvested annually, and over 100,000 deer are harvested annually.

The IBMP is a far more sophisticated program than mere population control–there are many more moving parts to the IBMP than just population control–but at one level, the Plaintiffs are complaining about the IBMP's indirect method of conducting an annual harvest of Yellowstone bison. Animals leaving the Park found to be infected with brucellosis are lethally removed. Those not proven to be infected with brucellosis, merely brucellosis-exposed, may or may not be lethally removed, depending on the numbers of bison involved, the

17

likelihood that those apparently healthy bison will again leave the Park, and the ability of the Park to hold the bison in pens for the winter.  The discretion of the NPS to make these decisions is informed by the IBMP, by the FEIS supporting the IBMP, and by the scientific management practices within the agency's expertise. Plaintiffs object to all government harvest, period.  That position is insupportable on this record.

Plaintiffs fail to persuade the Court that they face a likelihood of irreparable harm.  If the Court were to enjoin the functioning of the IBMP, a complex wildlife management program would be disabled and left in disarray.  Plaintiffs call for setting aside twenty years of effort.

The YNP bison could be harmed by the loss of the IBMP, because without that wildlife management program the State of Montana's fall-back position is to shoot bison as they enter the State of Montana.  Plaintiffs seek to prevent all culling of bison and to open up the Gallatin National Forest to allow the YNP herd to increase in abundance.  Under this scenario, it is to be expected that some portion of the YNP herd could begin to live year-round outside the Park.  Plaintiffs

18

have not revealed the next stage of their plan for the YNP herd–when eventually it could migrate beyond the Gallatin National Forest.  The equities do not favor Plaintiffs, because inevitably the YNP herd does have to be contained, either through population control or fencing, both of which are apparently opposed by Plaintiffs.

Yellowstone National Park spans 3,468 square miles.  Montana has allowed YNP bison outside the Park under the IBMP under a cautious and incremental process of adding additional winter range, and, of course, more range may be added in the future.  History has shown, however, that Montana will not tolerate unlimited and unmanaged migrations of brucellosis-exposed YNP bison onto its territory.  The NPS and Montana have carefully and with some difficulty worked out this program of wildlife management that allows for experimentation, learning, and improvement, which seem to be hallmark qualities of any good wildlife management program.  Thus, the equities do not favor Plaintiffs, much less tip sharply in their favor.

In concentrating their arguments on the disease of brucellosis, both parties

19

have understated other threats to public safety and property damage.  There are

very real public safety issues that must be addressed in balancing the equities.  The

administrative record contains references to the threats to public safety and

property damage.  For example, in 2009, the IBMP Annual Report records some of

the State of Montana's public safety concerns during the one-year period:

> Public safety complaints were as follows:
> - On May 26, 2009, MDOL received a complaint from a Lower Bear Trap resident (LS) about an aggressive bull bison that "squared off" with a young girl riding her horse on a road in the subdivision north of Duck Creek.
> - On May 27, 2009, MDOL received a complaint from an Upper Bear Trap resident (KW) about four bull bison next to his horses the Upper Bear Trap Subdivision north of Duck Cree.
> - On June 3, 2009, MDOL received a complaint from a Duck Creek area resident (KD) about aggressive bull bison around his house.
> - On June 17, 2009, MDOL received a complaint from a Duck Creek resident (CB) about bull bison around his horses, property, and children.

NPS AR 7579-80.

In 2010, the IBMP Annual Report reflects additional State of Montana

public safety concerns during the most recent reporting period:

20

FWP consulted with landowners who complained of property damage from bison.

MDOL received the following human safety and property damage complaints:

- On May 10, 2010, MDOL received a complaint from a resident of the South Fork/Zone 3 area (VC) about bison damaging six trees on his property.
- On May 11, 2010, MDOL received a complaint from a Duck Creek resident (JW) about bison eating hay and damaging fences.
- On May 12, 2010, MDOL received a complaint from two Duck Creek residents (CK & MW) about bison damaging fences on their property.
- On May 15, 2010, MDOL received a complaint from a resident of the South Fork/Zone 3 area (PP) about bison commingling with his horses and another complaint from a Duck Creek resident (CI) about bison near her horses.
- On June 6, 2010, MDOL received a complaint from a South Fork/Zone 3 resident (DJ) about bison on private property.
- On June 8, 2010, MDOL received a complaint from the West Yellowstone Police about a bull in the town of West Yellowstone.
- On June 9, 2010, MDOL received a complaint from the West Yellowstone Police about a bull in the town of West Yellowstone.
- On June 11, 2010, MDOL received a complaint from a resident of the South Fork/Zone 3 area (GM) about a bull on the rodeo grounds south of Hwy 20.
- On July 18, 2010, MDOL received a complaint from a South Fork/Zone 3 resident about bison on his property.

2010 IBMPAnnual Report, July 1, 2009 through July 31, 2010 at pp. 8-9.[7]  The

2010 IBMP Annual Report also reflects that YNP bison bulls damaged property in

the town of Gardner, north of the Park:

> Two bulls moved up the highway near Slip and Slide Ranch in
> April and hazing was attempted.  Ultimately, they were lethally
> removed by DOL agents.  There were two bulls in Gardiner
> that were hazed after damaging property.  These bulls were
> previously immobilized as part of an APHIS brucellosis
> transmission field study.  An additional single bull had to be
> hazed after damaging property at a hotel in Gardiner.  On two
> occasions a small group of bison were hazed off of the school
> grounds by FWP wardens.

2010 IBMP Annual Report at 9.

Having found that a balancing of the equities does not tip in Plaintiffs'

favor, the Court proceeds to consider whether the public interest would be served

by an injunction.  Certainly, one of the most important public interests at stake is

preserving a healthy YNP bison herd.  However, certain factual arguments in this

regard are erroneous and not supported by the record.  For example, the claim that

---

[7]  Available at http://ibmp.info/library.  Go to "IBMP 2010 Annual Report."

brucellosis has never been proven to be transmissible between bison and cattle is

not true.[8]  For another, the claim that the YNP herd is the only genetically pure[9]

conservation herd of bison is also not true.[10]  For a third, the claim that the YNP

_____

[8]  *See* Davis, D.S., J.W. Templeton, T.A. Ficht, J.D. Williams, J.D. Kopec, and L.G. Adams, "Brucella abortus in captive bison.  I. Serology, bacteriology, pathogenesis and transmission to cattle."  J. Wildlife Diseases 26 (3):360-371 (1990).

[9]  "Genetically pure" means that the YNP's herd genetic profile does not evidence interbreeding with cattle, which most commercial bison herds do show. The Court cannot help but note that if the YNP bison herd is to be maintained a cattle-free bloodline, the bison  must be prevented from commingling with cattle, not only to prevent disease but also to protect the YNP bison bloodline.  How would Plaintiffs maintain this genetic purity in a "free-roaming," "wild," and unmanaged bison herd free to roam outside YNP?  Plaintiffs' papers provide no answer; nor do the Pringle papers.

[10]  Gates, C.C., Freese, C.H., Gogan, P.J.P. and Kotzman, M. (Eds. And comps.) (2010).  *American Bison: Status Survey and Conservation Guidelines 2010*, Gland, Switzerland: International Union for Conservation of Nature and Natural Resources. There are nine genetically-pure conservation herds on the North American continent; Elk Island National Park (wood bison), Mackenzie Bison Sanctuary, Northwest Territories (wood bison), Wood Buffalo National Park, Alberta and Northwest Territories (wood bison), Elk Island National Park (plains bison), Grand Teton National Park, Henry Mountains State Park, Utah, Sully's Hill National Game Preserve, North Dakota, and Wind Cave National Park, South Dakota.  *Id.* at 23.  There are over 20,000 plains bison in 62 conservation herds.  *Id.* at 9.

herd is the last "wild" and "free-roaming" herd in the world is misleading.  The

YNP herd is only "wild" and "free-roaming" because the Park stopped penning,

feeding, and culling the animals in the 1970s, many decades after having

purchased half of the YNP herd in 1902, at a price of $15,000, from captive bison

herds in Montana and Texas.[11]  By Plaintiffs' definition of "free-roaming," any

conservation herd could be made into a free-roaming herd merely by taking down

its fences.  Nevertheless, and even though YNP herd is not the last repository of

plains bison genes, maintaining a healthy YNP bison herd is indeed very important

to the public interest.

There are multiple public interests at stake, however.  Some Montana

citizens are currently utilizing the legislative and political process to press their

claims.  Bills are pending before the Montana Legislature that demand that the

YNP herd be contained and properly managed.  *See supra* note 2.  Executive

---

[11]  *Interior Department Appropriation Bill, 1924: Hearing Before the Subcomm. Of the Comm. On Appropriations, United States Senate,* 67th Cong. (January 2, 1923) (statement of Arno B. Cammerer, Acting Director of the National Park Service) p. 46 (Comm. Print 1923).

Order No. 1-2011 underscores the concern that many Montanans have expressed regarding the disease status of the YNP bison herd.  These efforts and the Governor's Executive Order reflect the fact that there is a public interest in preventing the spread of brucellosis in Montana, and a public-interest in protecting human safety and minimizing property damage.

Having considered all of the competing interests, including the need to protect the environment and natural resources, the need to minimize property damage and the spread of disease, and the need to protect public safety, the Court concludes that the public interest is best served by finding a balance between the various public interests.  This means promoting the maintenance of a healthy bison herd and at the same time reducing the risk of brucellosis transmission, property damage, and threats to public safety.  The requested injunction does not serve all these interests.  An injunction would not serve the long-term best interest of the YNP bison herd and could unbalance the public interests that the IBMP seeks to protect.

25

**Conclusion**

This Court has determined that Plaintiffs are not entitled to succeed on the merits of the underlying litigation and that Plaintiffs have not presented serious questions on the merits.  No emergency exists.  Plaintiffs have not shown that they are *likely* to suffer imminent, irreparable harm.  Finally, the public interest is not served by granting the interim relief requested.

Accordingly,

IT IS HEREBY ORDERED that Plaintiff's Motion for Injunction Pending Appeal (Doc. 68) is DENIED.

Done and Dated this 10th day of March, 2011.

CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE

26